# Supreme Court of Florida

_____

No. SC12-263
_____

**RODNEY TYRONE LOWE,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

October 19, 2018

PER CURIAM.

This case is before the Court on direct appeal from a resentencing of death. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. Rodney Tyrone Lowe appeals his sentence of death for the 1990 first-degree murder of Donna Burnell. The trial judge sentenced Lowe to death after the new penalty phase jury recommended the death penalty by a vote of twelve to zero. We first set forth the factual and procedural background of this case and then address Lowe's claims, including his *Hurst v. Florida* (*Hurst v. Florida*), 136 S. Ct. 616 (2016), claim and his claim that his death sentence is disproportionate. For the reasons explained below, we affirm Lowe's sentence of death.

# FACTUAL AND PROCEDURAL BACKGROUND

Lowe was convicted by a jury and sentenced to death for the July 1990 first-degree murder of Donna Burnell. The jury also convicted Lowe of attempted robbery. We set forth the following facts in Lowe's first direct appeal:

> On the morning of July 3, 1990, Donna Burnell was working as a clerk at the Nu-Pack convenience store in Indian River County when a would-be robber shot her three times with a .32 caliber handgun. Ms. Burnell suffered gunshot wounds to the face, head, and chest and died on the way to the hospital. The killer fled the scene without taking any money from the cash drawer.
>
> During the week following the shooting, investigators received information linking the defendant, Rodney Lowe, to the crime. Lowe was questioned by investigators at the police station and, after speaking to his girlfriend, gave a statement that implicated him in the murder. Following this statement, Lowe was arrested and indicted for first-degree murder and attempted robbery.
>
> At trial, the State presented witnesses who testified that, among other things, Lowe's fingerprint had been found at the scene of the crime, his car was seen leaving the parking lot of the Nu-Pack immediately after the shooting, his gun had been used in the shooting, his time card showed that he was clocked-out from his place of employment at the time of the murder, and Lowe had confessed to a close friend on the day of the shooting. The State also presented, over defense objection, the statement Lowe gave to the police on the day of his arrest. Lowe advanced no witnesses or other evidence in his defense. After closing arguments, the jury returned a verdict finding Lowe guilty of first-degree murder and attempted armed robbery with a firearm as charged.

*Lowe v. State*, 650 So. 2d 969, 971 (Fla. 1994).

At the conclusion of the original penalty phase, the jury, by a vote of nine to three, recommended death. *Id.* at 972. The trial court followed the jury's recommendation and sentenced Lowe to death, finding two aggravators: (1) the

defendant was previously convicted of a felony involving the use or threat of violence to the person; and (2) the capital felony was committed while the defendant was engaged in or was an accomplice in an attempt to commit robbery. *Id.* The trial court also found that the mitigators did not outweigh the aggravators. *Id.* In addition to the sentence of death, the trial court sentenced Lowe to fifteen years' imprisonment for the attempted robbery conviction. *Id.*

On direct appeal, Lowe raised ten guilt phase issues and seven penalty phase issues. *Id.*[1] We rejected Lowe's arguments on all claims and affirmed his

1. Lowe asserted that: (1) the trial court erred in denying Lowe's motion to suppress his confession; (2) the trial court erred in allowing the jury to hear certain portions of Lowe's taped interrogation; (3) the trial court erred in admitting a box of Lowe's personal items; (4) he was denied his constitutional rights to effective assistance of counsel and the equal protection of the law when the trial court declined to appoint two attorneys for his defense; (5) the trial court erred in failing to conduct a hearing under *Nelson v. State*, 274 So. 2d 256 (Fla. 4th DCA 1973); (6) the trial court erred in denying a motion for disqualification; (7) county court Judge Wild lacked jurisdiction to preside over the instant felony; (8) the trial court erred in giving the State's special jury instruction; (9) the trial court erred in overruling defense counsel's objections to the State's closing arguments and in denying a motion for mistrial; (10) the trial court erred in granting the State's motion in limine; (11) the trial court erred in denying the defense's requested penalty phase instruction regarding the presence of the child at the murder scene; (12) the trial court erred in instructing the jury on the heinous, atrocious, or cruel (HAC) and cold, calculated, and premeditated (CCP) aggravating circumstances; (13) the State's penalty phase argument was improper; (14) the trial court gave excessive weight to the prior violent felony aggravator; (15) the trial judge erred in allowing evidence of the circumstances surrounding Lowe's prior felony to be admitted in the penalty phase; (16) the trial judge erred in failing to inquire into the whereabouts of two defense witnesses who failed to appear during the penalty

convictions and sentence of death. 650 So. 2d at 971. On October 2, 1995, the United States Supreme Court denied certiorari. *Lowe v. Florida*, 516 U.S. 887 (1995).

Lowe filed an initial motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.851. *Lowe v. State*, 2 So. 3d 21, 28 (Fla. 2008). Following several amended postconviction motions and amendments to these motions, the trial court held a *Huff*[2] hearing. 2 So. 3d at 28. The trial court summarily denied twelve of the thirty-three claims and held an evidentiary hearing on the remaining twenty-one claims. *Id.* Lowe filed two supplemental claims after the hearing, and an additional evidentiary hearing was set for the *Brady*[3] violation claim. 2 So. 3d at 28. After the second evidentiary hearing, the trial court issued an order denying all of Lowe's claims. *Id.*

Lowe then filed a successive postconviction motion based on newly discovered evidence and also filed a motion for rehearing. *Id.* The trial court held a hearing on the motion for rehearing and the first successive postconviction motion. *Id.* On March 18, 2005, the trial court issued an order denying a new trial

---

phase; and (17) the trial court did not consider or weigh mitigation. *See Lowe v. State*, 2 So. 3d 21, 28 n.1 (Fla. 2008).

2. *Huff v. State*, 622 So. 2d 982 (Fla. 1993).

3. *Brady v. Maryland*, 373 U.S. 83 (1963).

but granting a new penalty phase based on the motion for rehearing and the first successive motion. *Id.* at 29. Lowe appealed the trial court's denial of part of his postconviction motion, raising five claims. *Id.*[4] Lowe also petitioned for a writ of habeas corpus, raising three claims. *Id.*[5] The State cross-appealed. 2 So. 3d at 29.

---

4. Lowe claimed that:

(1) he was denied an adversarial testing at the guilt phase of his trial because trial counsel was ineffective, the State suppressed material exculpatory evidence, and newly discovered evidence has been disclosed, and for these reasons the jury did not know that Dwayne Blackmon was the shooter; (2) evidence that Lowe did not act alone was never presented to the jury because counsel failed to properly investigate and the State withheld evidence that multiple parties were involved in the crime; (3) because counsel was ineffective and the State withheld material evidence, critical impeachment of Dwayne Blackmon was never presented to the jury; (4) trial counsel rendered ineffective assistance by failing to object to irrelevant and inflammatory evidence; and (5) trial counsel rendered ineffective assistance by failing to challenge the admissibility of Lowe's statement on the ground that it was obtained in violation of his Fifth Amendment rights, and by failing to impeach Patricia White.

*Lowe*, 2 So. 3d at 29.

5. Lowe claimed that:

(1) appellate counsel was ineffective for failing to raise several claims on direct appeal; (2) Florida's capital sentencing statute is unconstitutional on its face and as applied because it violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; and (3) Lowe's death sentence is unconstitutional because the State used prior convictions based on acts committed by Lowe when he was a juvenile to establish an aggravating factor, in violation of the Eighth Amendment and *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005).

- 5 -

This Court affirmed the trial court's denial of relief on all claims raised by Lowe, affirmed the trial court's order granting a new penalty phase, and denied habeas relief. *Id.* at 46.

The new penalty phase commenced on September 12, 2011. On September 23, 2011, the jury unanimously recommended death. At the *Spencer*[6] hearing held on October 28, 2011, no additional evidence of aggravation or mitigation was presented. On January 26, 2012, the trial court followed the jury's recommendation and sentenced Lowe to death, finding that five aggravators, merged to four, outweighed one statutory mitigator and various nonstatutory mitigators.[7] This appeal follows.

---

*Lowe*, 2 So. 3d at 42.

6. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

7. The trial court found five aggravators, merged to four: (1) under sentence of imprisonment/on community control (great weight); (2) prior violent felony (great weight); (3A) murder in the course of a felony (great weight) merged with (3B) pecuniary gain; and (4) avoid arrest (great weight). The trial court found one statutory mitigator—statutory age (little weight). The trial court rejected the statutory mitigator that Lowe was a minor participant in a homicide committed by another person. Regarding the ten nonstatutory mitigators argued by Lowe, the trial court made the following findings: (1) good behavior while in confinement (moderate weight); (2) family relationships (little weight); (3) creative ability (not a mitigating circumstance—no weight); (4) maturity (little weight); (5) religious faith (little weight); (6) work ethic (little weight); (7) extracurricular sporting activities (not a mitigating circumstance—no weight); (8) Lowe is emotionally supportive of his sister (no weight); (9) low risk of future danger (little weight); and (10) good courtroom behavior (little weight).

# ISSUES ON APPEAL

Now on appeal from the new penalty phase, Lowe raises the following eighteen claims: (1) the trial court improperly granted the State a cause challenge to a prospective juror; (2) the trial court erred in overruling defense counsel's objection to the State's use of a mannequin; (3) the State's use of a computer-generated diagram of the crime scene as a demonstrative aid was improper; (4) the trial court erred in admitting Officer Ambrum's testimony regarding Lowe's possible sentence for a violation of community control; (5) the trial court erred in restricting mitigating evidence and limiting cross-examination; (6) the trial court erred in excluding the defense expert's testing results due to a discovery violation; (7) comments made by the State during closing amounted to fundamental error; (8) the trial court erred in sending prejudicial evidence not introduced at trial to the jury room for consideration during deliberations; (9) the trial court erred in precluding the jury from considering evidence of Lowe's limited role in the killing, disproportionate treatment compared to others, and a lawful evaluation of the aggravators; (10) the trial court erred in not instructing the jury to make a culpability finding before it considered imposing a death sentence; (11) the jury was misled regarding sentencing options by the trial court and the State; (12) the trial court erred in not independently weighing the aggravating and mitigating circumstances; (13) the aggravators found were not submitted to the jury properly

and were not supported by competent, substantial evidence; (14) the trial court did

not apply the correct law and its mitigation findings are not supported by record

evidence; (15) the trial court erred in denying Lowe's special verdict form and

instructions; (16) the incomplete record on appeal requires reversal; (17) death is

not a proportionate punishment in this case; and (18) cumulative error.  We address

each issue in turn.

## I.  Cause Challenge to Prospective Juror

Based on the responses prospective juror Charles Simard provided on his

juror questionnaire regarding the death penalty, the State conducted the following

voir dire:

> (Prosecutor) Mr. Butler:  You indicated also on your questionnaire that you don't believe in the death penalty?
> Charles Simard:  That's right.
> Mr. Butler:  Now at first glance it would look then like it might be difficult for you to sit as a juror in a case where the only issue is whether the Defendant receives a death sentence or life without the possibility of parole for twenty-five years; is that fair?
> Charles Simard:  Yes.
> . . . .
> Mr. Butler:  Given your personal opposition to the death penalty, are you going to be able to engage in that weighing process, or do you think that because of where you stand personally you're always going to tilt those scales towards -- towards a life sentence?
> Charles Simard:  Yes, I'd probably go for life.
> Mr. Butler:  And that's even though the Judge would tell you you're supposed to weigh it?
> Charles Simard:  Yes.
> . . . .
> (Defense counsel) Mr. Garland:  Do you think as you sit here today that you could put aside your personal opinions, and listen to

- 8 -

Judge Pegg's instructions and make a decision as to whether or not you could recommend life or death in this case?
        Charles Simard:  I think so.
        Mr. Garland:  You think you can follow the law?
        Charles Simard:  Uh-huh.
        Mr. Garland:  Is that a yes?
        Charles Simard:  Yes.

At sidebar, the State moved for a cause challenge, arguing that Mr. Simard told the defense he could follow the law, but told the State otherwise.  The State argued that "there's certainly a reasonable doubt as to whether [Simard] can be fair and impartial."  Defense counsel objected, arguing that Mr. Simard's responses did not rise to the level of a cause challenge, and suggesting that "if the State wants to use a peremptory that's up to them."  The trial court granted the State's challenge, finding that it was "not convinced" by Mr. Simard.  The State later withdrew its cause challenge and substituted a peremptory challenge before the jury was sworn in.  Defense counsel did not make a specific objection to the substitution.

Lowe argues that Mr. Simard merely voiced a general objection to the death penalty and thus the trial court reversibly erred by granting the State's cause challenge.  Lowe further argues that the error was not cured by the trial court's subsequent decision to allow the State to substitute a peremptory strike against Mr. Simard.  Lowe relies on this Court's decision in *Ault v. State*, 866 So. 2d 674 (Fla. 2003).  The State counters that Mr. Simard's answers were inconsistent and the

- 9 -

trial court thus made the proper credibility finding. The State further contends that *Ault* is distinguishable. We conclude that *Ault* does not entitle Lowe to relief.

In *Ault*, we concluded that it was reversible error for the trial court to have dismissed a prospective juror for cause where the juror's responses to questioning indicated "that she could put her personal feelings aside and be fair in the penalty phase and that she could be fair in the guilt and penalty phases even though she opposed the death penalty." *Id.* at 685-86. We also concluded that the erroneous removal for cause was not subject to a harmless error analysis. *Id.* at 686. We relied on *Gray v. Mississippi*, 481 U.S. 648, 664-65 (1987), and rejected the State's argument that "the error was harmless as the State had two peremptory challenges left at the end of voir dire questioning and could have used one of these to strike" the juror at issue. *Ault*, 866 So. 2d at 686.

At the outset, we note that unlike *Ault*, *Gray*, and other cases rejecting the "unexercised peremptory argument," this case involves the trial court permitting the State to substitute a peremptory strike before the jury was sworn, as opposed to the State presenting an argument on appeal regarding what the State would have done at trial. We also note that Lowe did not object to the substitution. Nevertheless, because we conclude that the trial court did not err in granting the initial cause challenge, we need not reach the question of whether such a substitution can cure an erroneous removal for cause.

We review a trial court's ruling on a cause challenge under an abuse of discretion standard. *Singleton v. State*, 783 So. 2d 970, 973 (Fla. 2001). We have held that "[a] juror should be excused for cause if there is any reasonable doubt about the juror's ability to render an impartial verdict." *Id.* "However, prospective jurors may not be excused for cause simply because they voice general objections to the death penalty." *Ault*, 866 So. 2d at 684 (citing *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968)). Instead, as it relates to a prospective juror's views on capital punishment, "[t]he relevant inquiry . . . is 'whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with [the court's] instructions and [the juror's] oath." ' " *Id.* (alterations in original) (quoting *Gray*, 481 U.S. at 658 (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985))). The Supreme Court has recognized that "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror." *Witt*, 469 U.S. at 425-26.

In *Ault*, we ordered a new penalty phase after concluding that the trial court erroneously dismissed a potential juror for cause based on the juror's "opposition to the death penalty." *Ault*, 866 So. 2d at 683. But we did so because the trial court's determination was based on an "erroneous recitation of [the prospective

juror's] statements." *Id.* at 685. Among other things, we noted that, despite the State's argument to the contrary, the prospective juror never indicated that she "would not impose death even if the aggravating circumstances outweighed the mitigating." *Id.* Here, on the other hand, Mr. Simard gave two conflicting responses, one of which specifically informed the prosecutor that he would "probably go for life" irrespective of the trial court's instruction regarding the weighing of the evidence. The statement was more than merely voicing a general objection to the death penalty. Moreover, Mr. Simard then gave an "uh-huh" response when asked by defense counsel whether he could follow the law, before being asked again and stating "yes." The trial judge personally observed Mr. Simard and was "not convinced." On this record, we cannot say that the trial court abused its discretion in concluding that Mr. Simard could not "faithfully and impartially apply the law." *Witt*, 469 U.S. at 426; *see also Taylor v. State*, 638 So. 2d 30, 32 (Fla. 1994) ("The trial judge found [the prospective juror's] answers conflicting and properly exercised the court's discretion in excusing [her]."). Accordingly, Lowe is not entitled to relief as to this claim.

## II. The State's Use of a Mannequin

During the State's direct examination of the medical examiner, the State sought to use a mannequin as a demonstrative aid in order to show the position of the gun in relation to Burnell's body. Defense counsel objected to the use of the

mannequin, arguing that the anatomical figure had zero probative value "as far as assisting the jury in determining where the bullet came from" and noting that the medical examiner testified that he could not opine as to specific trajectories. The trial court overruled the objection, questioning what the difference was if the medical examiner was "off a few degrees one way or another" and noting that the mannequin was "just a gray faceless body part" and not a gruesome reproduction of the victim. The medical examiner then used the mannequin, which was slightly taller and thinner than Burnell and had dowels inserted into it, to demonstrate the relative trajectories of the three bullets that entered the victim's body. The medical examiner testified that because he could not state what position Burnell was actually in when she was shot, he could only give anatomical, not spatial, trajectories, and that the trajectories had a small degree of error.

"The standard of review for the use of a demonstrative aid at trial is abuse of discretion." *Williams v. State*, 967 So. 2d 735, 752 (Fla. 2007). In *State v. Duncan*, 894 So. 2d 817 (Fla. 2004), we affirmed the standard set out in *Brown v. State*, 550 So. 2d 527, 528 (Fla. 1st DCA 1989), that:

> Demonstrative exhibits to aid the jury's understanding may be utilized when relevant to the issues in the case, but only if the exhibits constitute an accurate and reasonable reproduction of the object involved. The determination as to whether to allow the use of a demonstrative exhibit is a matter within the trial court's discretion.

*Duncan*, 894 So. 2d at 829 (quoting *Brown*, 550 So. 2d at 528). In *Duncan*, we concluded that it was within the trial court's discretion to allow an eyewitness to demonstrate the attack by using a dummy in place of the victim. *Id.* at 829-30. Among other things, we noted that the "dummy was used to aid the jury's understanding of a relevant issue . . . and there is no claim that the exhibit was not an accurate and reasonable reproduction of the attack." *Id.* at 830. We also noted that there was no claim that "the dummy was altered to resemble the victim and thereby evoke a more emotional action from the members of the jury." *Id.*

Here, the use of the mannequin satisfies *Duncan*. The mannequin was used to set out the circumstances of the crime and to attempt to establish aggravation. The mannequin was used to demonstrate the location of the gunshot wounds, the angle of impact against the skin, and the incapacitating nature of each gunshot. The jury was advised that the trajectories were anatomical, not spatial, and had a small degree of error. There only were slight differences between Burnell's size and the mannequin's dimensions, and there is nothing to suggest that the mannequin was altered to resemble Burnell. Accordingly, the trial court did not abuse its discretion, and Lowe is not entitled to relief as to this claim.

### III. The State's Use of a Computer-Generated Diagram

During opening statements, the State used a computer-generated diagram of the crime scene, that is, the interior of the Nu-Pack convenience store. Defense

counsel asked to approach the bench. At sidebar, defense counsel noted that the diagram "appears to be some sort of computer recreation of the event or the store." Defense counsel also noted that they had "never seen" the diagram and that they could not see it from the defense table. Defense counsel then noted that "it's just a diagram, but still." The State explained that "it's just the diagram," that there were no "figures or anything," and that it would not be introduced into evidence. Defense counsel then stated for the record that "it is animated and there's moving along as [the prosecutor] talks." The trial judge overruled defense counsel's objection and concluded that the diagram was a demonstrative aid, it was not a recreation of the crime scene, it was just "a picture," there was no animation of a building, and there were no people. The trial judge then sent out the jury and had the seating rearranged to accommodate defense counsel and Lowe. Lowe now argues that the trial court failed to conduct a proper *Richardson*[8] inquiry after the defense objected to the State's use of the computer animation.

We review the trial court's decision to allow the use of the computer-generated diagram under an abuse of discretion standard. *Williams*, 967 So. 2d at 752. "It is well settled that the use of 'demonstrative devices to aid the jury's comprehension is well within the court's discretion.' " *McCoy v. State*, 853 So. 2d

_____

8. *Richardson v. State*, 246 So. 2d 771 (Fla. 1971).

- 15 -

396, 405 (Fla. 2003) (quoting *United States v. Possick*, 849 F.2d 332, 339 (8th Cir. 1988)).  Demonstrative aids may be used when they are "relevant to the issues in the case" and "constitute an accurate and reasonable reproduction of the object involved."  *Brown*, 550 So. 2d at 528.

Here, the State used the computer-generated diagram as a demonstrative aid to help the jury visualize where the crime took place.  The State used the picture to identify specific locations in the store that would be relevant to the aggravation the State hoped to prove in the case.  There is nothing to suggest that the diagram was an inaccurate or unreasonable reproduction of the interior of the Nu-Pack store.  Moreover, there is nothing to suggest that the diagram was an animated recreation of the crime or included depictions of the people involved.

Lowe fails to explain how this "diagram" that was "not a recreation situation," that was never admitted into evidence, and that was never used with any witness constitutes a discovery request violation.  Even assuming that a *Richardson* inquiry was required, we see no conceivable prejudice to Lowe.  *See Smith v. State*, 7 So. 3d 473, 505-06 (Fla. 2009) (noting that failure to conduct a *Richardson* hearing is not per se reversible error); *State v. Schopp*, 653 So. 2d 1016, 1020 (Fla. 1995) ("[T]here are cases . . . where a reviewing court can say beyond a reasonable doubt that the defense was not prejudiced . . . .").  Lowe presents no explanation of how the diagram could have "materially hindered the

defendant's trial preparation or strategy." *Smith*, 7 So. 3d at 506 (quoting *Scipio v. State*, 928 So. 2d 1138, 1150 (Fla. 2006)). The only case cited by Lowe, *Jones v. State*, 32 So. 3d 706, 710-11 (Fla. 4th DCA 2010), is wholly distinguishable, as it involved the late disclosure by the State, in the middle of the trial, of a threat allegedly made by the defendant against the victim.

The trial court did not abuse its discretion in allowing the State to use the computer-generated diagram. Consequently, we deny relief as to this claim.

### IV. Officer Ambrum's Testimony

Lowe argues that Officer Ambrum, who was Lowe's probation officer at the time of Burnell's murder, erroneously testified regarding the maximum sentence Lowe faced for the violation of community control (VOCC) and that the erroneous testimony was used to mislead the jury regarding the avoid arrest aggravator. Lowe also contends that the State relied on this testimony during its closing to argue for the aggravator. We conclude that these arguments were not preserved at trial and that Lowe cannot demonstrate fundamental error.

During direct examination, after multiple sustained objections caused the State to have to rephrase its question, the State asked Officer Ambrum what "the maximum penalty Mr. Lowe would look at under the law at that time if he was violated under community control." Officer Ambrum testified that he "believe[d] it would be somewhere in the area of thirty years." Defense counsel did not object.

- 17 -

On cross-examination, defense counsel asked Officer Ambrum about that testimony given that Lowe had been sentenced as a youthful offender for the previous robbery he committed in 1987. Officer Ambrum was clearly uncertain regarding how the youthful offender statute worked and the impact a new substantive crime would have on Lowe's community control:

> Q. Now, certainly your answer would be different if you were told that the person were sentenced as a youthful offender; correct?
> A. At that time I'm not sure what they -- I know that there's been some changes with the -- whether or not they were in violation, I'm not sure what the law was on that at that time.
> . . . .
> Q. Isn't it true that someone sentenced as a youthful offender is looking at a different potential maximum sentence than someone convicted as an adult?
> A. Possibly.
> Q. Thus the different classifications; correct?
> A. But I have seen youthful offenders go back to court on a violation. Are you talking about being out -- sentenced outside of youthful offender, too?
> Q. So you're aware of the youthful offender statute; correct?
> A. If I understand you correctly you're asking me if -- if he would have only be (sic) able to be sentenced to six years probation?
> Q. I'm asking is there a difference between being sentenced as a youthful offender -- your knowledge, is there a difference between being sentenced as a youthful fender (sic) and as an adult?
> A. Yes, absolutely.
> Q. And the distinction is with regard to potential maximum penalty; correct?
> A. To my knowledge it's the initial sentence, not potential.

Despite Officer Ambrum's clearly uncertain testimony, the State in its closing argument did make one mention of Officer Ambrum's testimony that Lowe "could get up to thirty years for violating his community control." The State did so in the

- 18 -

overall context of arguing the avoid arrest aggravator and that Lowe "does not like to get caught" and knew he would go back to prison if he were arrested for the Nu-Pack robbery. The State also mentioned that Lowe would get more time for any new offense. Lowe did not object to the State's closing argument.

The State concedes on appeal that Officer Ambrum misstated the law and that in no event would the maximum sentence be more than six years, less credit for time served. However, the State argues that the misstatement does not render the sentence fundamentally unfair and does not detract from the evidence supporting the avoid arrest aggravator, given that Officer Ambrum's testimony was not the thrust of the State's argument for the aggravator. We agree.

Admission of evidence is within the trial court's discretion, and its ruling will be upheld absent an abuse of discretion. *Williams v. State*, 967 So. 2d 735, 747-48 (Fla. 2007). Likewise, control of prosecutorial argument lies with the trial judge and will not be disturbed absent an abuse of discretion. *Esty v. State*, 642 So. 2d 1074, 1079 (Fla. 1994). "To preserve error for appellate review, the general rule is a contemporaneous, specific objection must occur during trial at the time of the alleged error." *Gore v. State*, 964 So. 2d 1257, 1265 (Fla. 2007). When an alleged error is unpreserved—as is the case here—"this alleged error must constitute a fundamental error" in order to be reversible. *Doty v. State*, 170 So. 3d 731, 743 (Fla. 2015). To constitute fundamental error, it must be shown that the

error " 'reaches down into the validity of the trial itself' and that a sentence of death 'could not have been obtained without the assistance of the alleged error.' " *Id.* (quoting *Snelgrove v. State*, 107 So. 3d 242, 257 (Fla. 2012)).

We conclude that Officer Ambrum's testimony and the State's reliance on that testimony do not rise to the level of fundamental error. During the specific segment of closing argument in which the State argued for the avoid arrest aggravator, the State did not mention Officer Ambrum's testimony and instead largely focused on the fact that when Lowe walked into the Nu-Pack store, he recognized Burnell from another store where he had become friends with her. And the State argued that, unlike the previous robbery Lowe committed in 1987, he did not want to leave behind a witness who could identify him. The State then went through the facts that supported its conclusion that Lowe killed Burnell because he wanted to avoid arrest and not leave a witness. Namely, the State explained that: Lowe spent time in the store getting a soda and putting a hamburger in the microwave and had a chance to reflect before making the conscious choice to kill Burnell; Lowe then shot Burnell three times; common sense dictated that the first gunshot was to the top of Burnell's head as she was bent over tending to her three-year-old nephew[9]; there were no signs of a struggle; Burnell offered no resistance

---

9. In our original decision affirming Lowe's conviction and death sentence, we referred to the three-year-old child as Burnell's son. *Lowe*, 650 So. 2d at 975-

as she was with her nephew; Lowe did not wear gloves or a mask; and there were numerous pieces of evidence, including the position of Burnell's body, indicating that Burnell was shot before any attempt was made to retrieve the money from the register. The State then summed up its argument for the avoid arrest aggravator:

> Why do you do that but to avoid an arrest, avoid being recognized, avoid being apprehended?
> Why would you kill the clerk first? Because his motivation changed. He wanted to eliminate Donna Burnell who he knew, and who knew him from six months earlier at Fran's Market.
> That's the aggravator of avoiding an arrest.

While the State did later mention Officer Ambrum's testimony, it was not central to the State's argument for the aggravator. Moreover, with respect to the aggravator, the trial court's sentencing order made no mention of the possible sentence Lowe would face for a VOCC and only mentioned that Lowe was on community control and would have returned to prison. The trial court also found that a death sentence was justified even without the avoid arrest aggravator.

Lowe has not shown that the aggravator, much less his death sentence, "could not have been obtained without the assistance of the alleged error." *Doty*, 170 So. 3d at 743. Accordingly, we deny Lowe relief as to this claim.

---

76. Testimony in the new penalty phase revealed that the child was Burnell's nephew, but Burnell was raising him as her own and trying to adopt him.

## V. Trial Court's Restriction of Mitigation and Cross-Examination

Lowe argues the trial court erred in sustaining the State's objections to testimony implicating Lorenzo Sailor in the shooting and to the admission of Dwayne Blackmon's sworn affidavit. Testimony was presented that Lowe, Sailor, and Blackmon had twice before gone to the Nu-Pack store together intending to rob the store but left both times without committing the robbery due to the presence of potential witnesses. It was Lowe's position that Sailor and Blackmon were also involved in the third and final attempted robbery that resulted in Burnell's murder. Lowe claims that the trial court's rulings unlawfully restricted his mitigation presentation and limited his cross-examination of Officer Green.

Regarding Sailor, Lowe sought to present bad character testimony that Sailor and another individual, sometime before and unrelated to Burnell's murder, had been seen by Officer Ewert pointing guns at traffic after Officer Ewert responded to reports of shots being fired at an elementary school. Sailor later pointed the gun at Officer Ewert before he (Sailor) and the other individual dropped their guns and ran through the woods. Lowe argued that the testimony was relevant to the defense's theory that Sailor participated in the robbery of the Nu-Pack store and was a potential suspect who was not investigated. The defense further argued that the gun incident with Officer Ewert showed Sailor's "proclivity for pointing guns at law enforcement" and that Sailor was "not afraid to engage in gun play."

Admission of evidence is within the trial court's discretion, and its ruling will be affirmed absent an abuse of discretion. *Williams*, 967 So. 2d at 747-48. Relevant evidence is evidence that "tend[s] to prove or disprove a material fact." § 90.401, Fla. Stat. (2017). In the penalty phase context, the jury may not be barred from considering "any aspect of a defendant's character or record and any of the circumstances of the offense" offered as mitigation. *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). "[T]he sentencer may not be precluded from considering . . . any constitutionally relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998).

We conclude that the trial court properly excluded the testimony regarding Sailor. Even if credible evidence showed Sailor to be involved in Burnell's murder—which the trial court concluded was not shown—Sailor's prior criminal act of pointing a gun at traffic and at Officer Ewert had no relevance to any aspect of Lowe's character or record, or to any circumstances of the murder and attempted robbery.[10] Accordingly, the trial court did not abuse its discretion.

Regarding Blackmon's affidavit, Blackmon, who was deceased at the time of the resentencing trial, had signed an affidavit in October 1990 in which he stated

_____

10. In any event, Lowe was improperly offering Sailor's prior act of misconduct solely to prove Sailor's bad character or propensity. *See* § 90.404(1), (2)(a), Fla. Stat. (2017).

that Officer Green and another officer had made certain promises and threats. During cross-examination of Officer Green, Lowe attempted to impeach Officer Green with Blackmon's affidavit. The State objected to the introduction of the affidavit into evidence as well as to any direct reading from the affidavit. The trial court eventually sustained the objection but ruled that, among other things, defense counsel could directly ask Officer Green "any questions . . . about whatever he said to Mr. Blackmon," including whether he intimidated or threatened Blackmon. Defense counsel then asked Officer Green whether he made certain specific promises and threats to Blackmon. Officer Green denied doing so.

"To impeach a witness by use of a prior inconsistent statement pursuant to section 90.608, Florida Statutes (2008), the prior statement must be both (1) inconsistent with the witness's in-court testimony, and (2) the statement of the witness." *Wilcox v. State*, 143 So. 3d 359, 383 (Fla. 2014). The State cites *Wilcox* for the proposition that a witness may never be impeached with another person's affidavit. The State misreads *Wilcox*. In *Wilcox*, this Court concluded that the trial court did not abuse its discretion in sustaining the State's objection to an attempt to impeach a witness with an arrest affidavit. *Id.* at 384. We approved the trial court's decision not on the basis that the affidavit was an affidavit of another person but rather, in part, on the basis that the statements in the affidavit "were not 'statements of the witness' as contemplated by section 90.608." *Id.* at 383.

Namely, the affidavit only included a summation of statements made by four witnesses and briefly stated that those witnesses "denied any knowledge or involvement" in the crime. *Id.* Moreover, in *Williamson v. State*, 961 So. 2d 229, 234-35 (Fla. 2007), this Court in a postconviction case theorized that the defendant there could have introduced, under section 90.608, the affidavit of an unavailable (deceased) declarant to impeach one of the State's key witnesses through prior inconsistent statements and to show the witness's bias in favor of the State, assuming the witness first denied the statements. Ultimately, this Court in *Williamson* concluded that the affidavit was inadmissible as substantive evidence and that even assuming the affidavit was admissible to impeach the witness, the affidavit would not have probably produced an acquittal or conviction of a lesser included offense on retrial. *Id.* at 235.

Here, even assuming that Lowe should have been permitted to introduce Blackmon's affidavit—but only to the extent that the purported statements could be isolated to Officer Green, and only after the proper foundation had been laid and Officer Green first denied making the statements—any such error was harmless. Prior to the State's objection, defense counsel made the jury aware of Blackmon's affidavit (which defense counsel was holding) and the general accusations against Officer Green. After the objection was sustained, defense counsel directly questioned Officer Green regarding whether he ever threatened Blackmon with the

electric chair, whether he mentioned to Blackmon that he could be prosecuted as an accomplice and serve fifty to one hundred years, and whether he told Blackmon that in order for Blackmon to receive reward money he would have to testify that Lowe committed the murder. It is clear from the context that the jury understood that Lowe was questioning Officer Green regarding the specific accusations Blackmon made against Officer Green. Accordingly, we conclude that Lowe is not entitled to relief as to this claim.[11]

## VI. Defense Expert's Testing Results

Lowe argues that the trial court, without an adequate *Richardson* hearing and consideration of alternatives, excluded scientific statistical evidence that would have supported the lack of future violence mitigator.

During the latter portion of defense counsel's direct examination of its medical expert, Dr. Riebsame, defense counsel asked him whether he had enough information to form a risk assessment regarding the likelihood or absence of Lowe's future violence. Dr. Riebsame answered in the affirmative and then

---

11. We also note that during Lowe's prior postconviction case, Lowe argued to this Court that Blackmon had "attempted to recant his affidavit and accused the assistant public defenders of forcing him to sign the affidavit even though some of the facts in the affidavit were not true." *Lowe*, 2 So. 3d at 36. Blackmon himself testified at the postconviction evidentiary hearing that, among other things, "most of the statements in the affidavit were either lies or statements that had been twisted." *Id.*

- 26 -

discussed how he looks at certain risk factors in coming up with a probability of low, medium, or high risk of reoffending or doing something violent again. Dr. Riebsame went on to note that "we can even do what's known as an actuarial assessment like your insurance agent would do" and testified that "the most widely used actuarial statistical tool" for predicting future violence is called the "violence risk appraisal guide." After explaining that this tool involves looking to the presence or absence of various factors, Dr. Riebsame then briefly discussed those factors. When defense counsel then asked Dr. Riebsame "where does Mr. Lowe fall on that scale," the State objected and asked to approach. At sidebar, the State objected, on the basis of a discovery violation, to Dr. Riebsame discussing the specific test results. The State explained that it had deposed Dr. Riebsame one month earlier and that the statistical tool was neither discussed during the deposition nor listed in Dr. Riebsame's report that was provided to the State prior to the deposition.[12] Defense counsel explained that he had just found out about it in the hall while discussing Dr. Riebsame's testimony with him. The trial court sent the jury out and conducted a *Richardson* hearing. The State argued that it was "completely prejudiced," given that, based on Dr. Riebsame's deposition, the State

_____

12. For unexplained reasons, Dr. Riebsame appears to have performed the statistical analysis at issue during the one-month period between the date of his deposition and the day he testified at trial, even though he testified that it was "the most widely used actuarial statistical tool for predicting violence in the future."

chose not to bring its expert, Dr. Rifkin, for rebuttal.  The State also argued that the discovery violation was taking place on what was effectively the last day of the new penalty phase and that the State had no ability to cross-examine or even research whether such testing met the *Frye*[13] standard.  The defense countered that they had already gotten "well into" Dr. Riebsame's testimony on the subject before the objection.

The trial court concluded that the discovery violation was not intentional but was also not trivial and impaired the State's ability to cross-examine or to present its own testimony.  The trial court noted that the violation was taking place "at the eleventh hour and fifty-ninth minute" and involved a subject with which the State was not familiar.  The trial judge ruled that Dr. Riebsame was "not precluded from giving his opinion, he's just precluded from saying I conducted this test and on the basis of this test I'm concluding this."  Defense counsel then pointed out that Dr. Riebsame had other bases to talk about his opinion, and the trial court made clear that Dr. Riebsame was free to testify to those things but was simply precluded from discussing the calculations he made after his deposition.

When the jury returned, Dr. Riebsame testified that he was able to render an expert opinion regarding Lowe's likelihood of future violence based on the

---

13.  *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

information he knew about Lowe "and the testing" he carried out. Dr. Riebsame then explained the factors that diminished the risk of Lowe reoffending, as well as the risk factors that increased the likelihood of Lowe reoffending. He also testified that the risk varied based on whether Lowe was in or out of custody, with Lowe presenting "a minimal risk of a violent offense" if in custody. Finally, when asked whether there are "greater factors that lower or increase" the risk, Dr. Riebsame testified that the greater lowering factors were that Lowe was now forty years old as opposed to twenty years old when he carried out the violent offense and violated community control, that Lowe continued to have no history of a substance abuse problem, and that Lowe had no severe mental health disorder. On cross-examination, the State did not attack Dr. Riebsame's conclusions on the basis of a lack of statistical analysis testing. Instead, the State asked Dr. Riebsame whether he would agree that human behavior "is extremely unpredictable," and the doctor answered in the affirmative. The State then asked questions which indicated that Lowe previously behaved well while he was at a juvenile facility and again when he went to the Department of Corrections in 1988 but that each time when he got out he reoffended. And Dr. Riebsame testified "that's true."

When a trial court has notice of a discovery violation, *Richardson* holds that the trial court's discretion can only be properly exercised once it has determined: (1) whether the violation was willful or inadvertent; (2) whether it was trivial or

substantial; and (3) whether it had a prejudicial effect on the opposing party's trial preparation. *Richardson*, 246 So. 2d at 775. This Court will then review the record "to determine if this full inquiry was made and if the trial court's actions pursuant to the inquiry were proper." *McDuffie v. State*, 970 So. 2d 312, 321 (Fla. 2007). This Court will reverse a trial court's decision on a *Richardson* hearing only upon a showing of abuse of discretion. *See Rimmer v. State*, 59 So. 3d 763, 787 (Fla. 2010). We have previously noted that the exclusion of evidence for a discovery violation "should only be imposed when there is no other adequate remedy." *McDuffie*, 970 So. 2d at 321. Moreover, this "extreme sanction [is] to be employed only as a last resort and only after the court determines no other reasonable alternative exists to overcome the prejudice and allow the witness to testify." *Delhall v. State*, 95 So. 3d 134, 162 (Fla. 2012). That is especially true when there is "a defense discovery violation, because there are few rights more fundamental than the right of an accused to present evidence or witnesses in his own defense." *Id.* at 162-63 (citing *McDuffie*, 970 So. 2d at 321).

Here, it appears the trial court excluded the testimony as a "first resort," *id.* at 163, as opposed to a last resort. Indeed, the trial court does not appear to have "considered less extreme alternatives before excluding the testimony." *Dawson v. State*, 20 So. 3d 1016, 1018 (Fla. 4th DCA 2009). However, we conclude that any error by the trial court was harmless beyond a reasonable doubt.

Prior to the State's objection, the jury was made aware that Dr. Riebsame conducted a risk assessment using a statistical model for predicting future violence known as the "violence risk appraisal guide." And the jury was made aware of the various factors that are relevant to that risk assessment. Defense counsel himself recognized that the defense had gone "well into" Dr. Riebsame's testimony on the subject before the State objected. After the State's objection, the jury was permitted to hear Dr. Riebsame's expert opinion regarding Lowe's likelihood of future violence, including Riebsame's other bases for his opinion. The full context of the record reveals that Dr. Riebsame's expert opinion was that there was a low risk of Lowe engaging in violence in the future. And Dr. Riebsame testified that he formed his expert opinion based on the information he knew about Lowe as well as "the testing" he "carried out." He further testified that he "appl[ied] that information to what we know are specific factors associated with reoffending or not reoffending in a violent fashion." The jury was clearly informed that Dr. Riebsame's determination was that Lowe had a low risk of future dangerousness and that the determination was made, in part, by the use of a statistical model. Moreover, the trial court found the mitigator proven. We conclude that "there is no reasonable possibility" that the trial court's failure to consider any alternative remedies contributed to Lowe's death sentence. *Delhall*, 95 So. 3d at 164. Accordingly, we deny relief as to this claim.

## VII. State's Comments during Closing Argument

Lowe argues that the State made several improper comments during its closing argument that warrant reversal. Specifically, he claims that the State used victim impact statements to compare the worth of Burnell and Lowe and that the State argued to the jury that Lowe had been sentenced to death before and should be again because nothing had changed since then.

Control of prosecutorial argument lies within the trial court's sound discretion, and will not be disturbed absent an abuse of discretion. *Esty*, 642 So. 2d at 1079. "Wide latitude is permitted in arguing to a jury. Logical inferences may be drawn, and counsel is allowed to advance all legitimate arguments." *Breedlove v. State*, 413 So. 2d 1, 8 (Fla. 1982) (citations omitted). However, prosecutorial argument "must not be used to inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant rather than the logical analysis of the evidence in light of the applicable law." *Bertolotti v. State*, 476 So. 2d 130, 134 (Fla. 1985). "Any error in prosecutorial comments is harmless, however, if there is no reasonable possibility that those comments affected the verdict." *King v. State*, 623 So. 2d 486, 488 (Fla. 1993).

Lowe points to the following statements made by the State during its closing arguments:

How about the Defendant has changed and grown spiritually since he was convicted of first-degree murder? Well, that's good, that's a good thing. But, really, when you stack it up against Donna Burnell's life, really, is that mitigating? Donna Burnell used her rosary every night. Is that really mitigating compared to what he did on July 3rd of 1990?

. . . .

They [Lowe's family] care about him. They love him. Donna Burnell loved her family. Her family cared about her.

. . . .

He is a caring and loving brother. We love the ones we have in our family. We love our family and we love that part of it. But Donna Burnell cared and loved her family, too.

. . . .

We know he wasn't doing well, we know what he was up to. We know what he was up to. Planning robberies, guns. Murdering innocent store clerks.

Does this outweigh what happened to Donna Burnell? Does it?

Think about what Rodney Lowe did that morning. Think about what he came from, what he was doing, his activities. His behavior prior to that. Does that outweigh what happened to Donna Burnell?

. . . .

Whether or not this Defendant matured over the last twenty years, behaved well in prison doesn't take away what happened to Donna Burnell.

Donna Burnell was a human being who cared about her family. Mr. Lowe should be held accountable for taking away that life.

Lowe did not contemporaneously object to any of these statements. Thus, Lowe is entitled to relief only if the "[u]nobjected-to comments . . . rise to the level of fundamental error." *Merck v. State*, 975 So. 2d 1054, 1061 (Fla. 2007). To meet this burden in the sentencing context, Lowe "must demonstrate that the error 'reaches down into the validity of the trial itself' and that a sentence of death 'could not have been obtained without the assistance of the alleged error.' "

- 33 -

*Hayward v. State*, 24 So. 3d 17, 42 (Fla. 2009) (quoting *Simpson v. State*, 3 So. 3d 1135, 1146 (Fla. 2009)).

In *Wheeler v. State*, 4 So. 3d 599, 610-11 (Fla. 2009), we cautioned the State and its prosecutors that it is improper to use victim impact evidence to urge juries "to compare the worth of the life of the victim against that of [the defendant]," but we declined to find fundamental error in that case because the unobjected-to prosecutorial comments were not "shown to have deprived [the defendant] of a fair penalty phase" and were not "shown to be so inflammatory that the jury's advisory verdict could not have been obtained without it." In *Hayward*, we again voiced our disapproval regarding prosecutorial use of victim impact evidence to "compar[e] the life or choices of the victim with that of the defendant." 24 So. 3d at 42-43. But we declined to find fundamental error in that case after viewing the unobjected-to prosecutorial comments "in the context of the entire closing argument and in light of the evidence presented in the penalty phase," namely, "the strength of the evidence against [the defendant] and the gravity of the aggravators." *Id.* at 42.

In light of *Wheeler* and *Hayward*, we conclude that the State's comments comparing Burnell's life and Lowe's life do not rise to the level of fundamental error. The comments at issue represented a very brief portion of the State's entire closing. Moreover, the comments were made in the context of discussing three

nonstatutory mitigators—family relationships, religious faith, and maturity—each of which the trial court found and weighed in the sentencing calculus. On this record, including the evidence presented and the fact that the jury was instructed on the proper use of victim impact testimony, it cannot be said that the unobjected-to comments deprived Lowe of a fair penalty phase or were "so inflammatory" that a sentence of death could not have been obtained without it. *Wheeler*, 4 So. 3d at 611.

Lowe also argues that the State impermissibly argued to the jury that he had been sentenced to death before and should be again because nothing had changed since then. Lowe did not make a contemporaneous objection to the State's closing, and we conclude that the State's references to the prior death sentence do not amount to fundamental error. In *Teffeteller v. State*, 495 So. 2d 744, 745-47 (Fla. 1986), we rejected a similar argument from a defendant who claimed that it was reversible error for the jury to have been informed of his prior death sentence that had been vacated by this Court. We did so on two separate grounds. First, we examined the record and concluded "that the prior sentence did not in any way play a significant role in th[e] proceeding and was not prejudicial to the [defendant]." *Id.* at 747. We also noted that the defendant's own witness, and the defendant himself, provided testimony that alluded to the defendant's prior sentence. *Id.* at 746. And we noted that none of the witness testimony mentioned

"the prior *jury's* recommendation, only that a death sentence had been imposed by the original trial *judge*." *Id.* at 747. Second, we concluded that the issue was unpreserved and that any error, including the prosecutor mentioning the prior sentence during closing argument, was not fundamental. *Id.* In a concurring opinion, Justice Barkett noted that "because the defendant himself advised the jury of his prior status on death row," a new penalty phase was not required. *Id.* at 748 (Barkett, J., concurring specially).

Here, before the State's closing argument, several of Lowe's own witnesses—through testimony elicited by defense counsel—informed the jury of Lowe's prior status on death row. First, Dale Resinella testified that he was the chaplain on death row and that he had provided counsel to Lowe. Later, Ron McAndrew, a retired warden, was asked by defense counsel if Lowe was "housed on death row" in a cell by himself, to which McAndrew responded in the affirmative. Finally, Lowe's mental health expert, Dr. Riebsame, described Lowe's case as a "postconviction appeal" involving "a person [who] has been on death row for 20 years." Although the State mentioned during closing that Lowe had been on death row for twenty years, it was only after defense counsel elicited testimony from its witnesses of the same fact. Moreover, a review of the record reveals that the State did not make the prior sentence a key feature of the proceedings. *Id.* at 746. And we do not find that the State's brief comments were

- 36 -

"so prejudicial or inflammatory that a new sentencing proceeding is required." *Id.* at 747 (citing *Blair v. State*, 406 So. 2d 1103 (Fla. 1981)).

Accordingly, we deny relief as to this claim.

## VIII. Evidence in Deliberation Room

Lowe argues that it was fundamental error for the trial court to allow a letter his mother, Sherri Lowe, wrote to him in 1988 to be given to the jury during deliberations, given that the letter was not admitted into evidence in the resentencing proceedings and contained prejudicial information. The letter was part of a box of personal contents that had been admitted into evidence as State's Exhibit 32 during the original trial. We reject Lowe's claim of fundamental error.

On cross-examination, the State presented Sherri with the letter and asked whether she recalled saying that, among other things, she thought the course Lowe was on "was leading to death." After Sherri testified that it "was certainly my handwriting, but I don't remember," defense counsel made a general objection and asked to approach. At sidebar, defense counsel asked if the letter was from the box of contents, and the prosecutor answered in the affirmative. The prosecutor explained that she was going to "admit it into evidence." Defense counsel countered that he did not know it was coming in and had not had a chance to read it. The trial judge then dismissed the jury for lunch, and defense counsel was given a chance to read the letter during the lunch break. After lunch, and before the jury

- 37 -

was recalled, the trial judge asked if counsel for both sides had "worked out any problems with [the letter]." Both responded in the affirmative. Without objection, the State then asked more questions of Sherri regarding the letter, while apparently inadvertently failing to have the letter admitted into evidence. Sherri testified that she recognized her handwriting and the letter itself and that she was very concerned about Lowe's behavior. On redirect, defense counsel asked Sherri, "What else is in that letter?" She responded:

> I was encouraging him to do what's right. I mean, we've always taught him bible principal, what is right and what is wrong, to obey or disobey. Now, of course I was encouraging him to go forth, to repent and turn around and go forth in a positive manner, according together [sic] scriptures.

Defense counsel then asked Sherri if she included a scripture verse in the letter, and she said "yes."

After closing arguments, the trial judge and counsel for both parties discussed the evidence that was going to be sent back to the jury. The trial judge specifically asked about the box identified as State's 32 and whether there was "a stipulation between the parties as to whether [the box] will go back to the jurors." The State responded that it had "agree[d] with the defense" that the box containing "a lot of personal items and some other stuff" would not be sent back to the jury. But the State specifically noted that the "letter that was used" would indeed be sent back. Defense counsel did not object or suggest that the State's response did not

- 38 -

accurately reflect what had been agreed to. The trial court then asked defense counsel if he had agreed not to send the box back, and he responded in the affirmative.

"As a general rule, it is improper to allow materials into the jury's deliberation room that have not been admitted into evidence if the materials are of such character as to influence the jury." *Gonzalez v. State*, 136 So. 3d 1125, 1145 (Fla. 2014). "However, it is not per se reversible error when any unauthorized materials are present in the jury room. Rather, where an objection is raised, Florida courts have applied a harmless error analysis." *Id.* (citing *Keen v. State*, 639 So. 2d 597, 599 (Fla. 1994); *State v. Hamilton*, 574 So. 2d 124, 129-30 (Fla. 1991)). Given the absence of any specific, contemporaneous objection, either to the examination of Sherri with the letter or to the trial court sending the letter back to the jury room, Lowe is entitled to relief only if the purported error rises to the level of fundamental error. *See Merck*, 975 So. 2d at 1061.

We have recognized that "[a] party may not invite error and then be heard to complain of that error on appeal." *Pope v. State*, 441 So. 2d 1073, 1076 (Fla. 1983); *see also Tomas v. State*, 126 So. 3d 1086, 1088 (Fla. 4th DCA 2012) (finding defendant consented to the unauthorized materials being given to the jury and thus any error was invited error). We have also recognized, in the context of certain erroneous jury instructions, a fundamental error analysis exception "where

defense counsel affirmatively agreed to or requested the incomplete instruction." *State v. Lucas*, 645 So. 2d 425, 427 (Fla. 1994), *receded from on other grounds by State v. Spencer*, 216 So. 3d 481 (Fla. 2017). However, we also recognized in that context that the exception did not apply "where defense counsel merely acquiesced to [the incomplete] instructions." *Spencer*, 216 So. 3d at 486; *see, e.g.*, *Black v. State*, 695 So. 2d 459, 461 (Fla. 1st DCA 1997) ("[D]efense counsel must be aware that an incorrect instruction is being read and must affirmatively agree to, or request, the incomplete instruction.").

Given this record, defense counsel's conduct goes well beyond mere acquiescence. Moreover, we conclude that any error was not fundamental. We agree with the State that the content of the letter was largely duplicative of Sherri's testimony—both on cross-examination and redirect—as well as certain other testimony, including from Dr. Riebsame. That is, Lowe had gotten into trouble at school and committed other crimes during his teen years, Sherri was concerned with his behavior, the family tried to counsel Lowe, Sherri encouraged Lowe to go forth and repent in accordance with the Bible, Lowe's brother had also been in trouble, and Lowe had been shunned by his family and their church congregation. *See Bottoson v. State*, 443 So. 2d 962, 966 (Fla. 1983) ("There is no prejudice where the information conveyed by the unauthorized materials merely duplicates

evidence that had been properly presented to the jury at the trial."). Consequently, we deny relief as to this claim.

## IX. Evidence Not Considered by Jury

Lowe argues the jury was precluded from considering evidence of his limited role in the killing, his disproportionate treatment compared to others involved, and a lawful evaluation of the aggravators. In support, Lowe points to the juror questionnaires as well as the instructions given at the outset and conclusion of the penalty phase. The instructions informed the jury that Lowe had been found guilty of first-degree murder and that the jury should only consider the sentence to be imposed, not guilt. Lowe contends that these instructions prevented the jury from considering "substantial" mitigation and accurately assessing aggravation. We find Lowe's argument unavailing.

In this Court's previous decision to uphold the trial court's grant of a new penalty phase, we found ineffective assistance of counsel under *Strickland*[14] regarding counsel's failure to "discover[] evidence to call into question Blackmon's alibi and Blackmon's contention that he did not participate in the crimes." *Lowe*, 2 So. 3d at 40. That evidence included testimony from Lisa Miller and Ben Carter "that Blackmon had confessed to his involvement in the crime

---

14. *Strickland v. Washington*, 466 U.S. 668 (1984).

- 41 -

during a conversation at Blackmon's grandmother's house." *Id.* at 41. This Court noted that although "there were some inconsistencies between the testimony of Miller and that of Carter as to the specific details of the crime," "the testimony of both witnesses provided credible support for two of the mitigating circumstances raised by defense counsel" and rejected by the trial court, namely, "the disproportionate punishment mitigator and the relatively minor participation mitigator." *Id.* And this Court noted that although there was evidence presented "that proved that Lowe was involved in the crime," the evidence did "not conclusively prove Lowe acted alone." *Id.* at 41-42.

During the new penalty phase, the State's theory continued to be that Lowe acted alone. And the defense's theory was that Lowe was a minor participant. During its opening statement, defense counsel informed the jury that the evidence, including "statements that were made by others after the fact," would show that Lowe did not act alone and was not the shooter. Defense counsel later called Miller and Carter—former girlfriend and boyfriend who had fourteen felony convictions and eleven felony convictions, respectively—who testified about admissions made by Blackmon years later while Blackmon was threatening other people. Miller claimed that Blackmon admitted to being the shooter, and Miller also claimed to have brought Blackmon's confession to the attention of several detectives. Carter similarly claimed that Blackmon admitted to being the shooter,

but Carter later claimed that Blackmon on several occasions said that Lorenzo Sailor was the shooter. Carter also denied ever telling the police about a conversation he overheard in which Lowe admitted he was the shooter. The State later presented several rebuttal witnesses to impeach both Miller and Carter. Those witnesses included Steve Kerby, a retired investigator with the State Attorney's Office, who testified that, a few days after Burnell's murder, Carter told him that he (Carter) overheard a conversation in which Lowe told Blackmon that he (Lowe) had attempted to rob the convenience store and had shot the attendant. During closing, defense counsel continued to argue that Lowe was not the shooter, instead asserting that Sailor was the shooter.

Defense counsel requested the minor participant mitigator instruction, which the trial court granted. The trial court instructed the jury that it could consider as a mitigating circumstance that Lowe "was an accomplice in a capital felony committed by another person, and his participation was relatively minor." The jury was also informed that "mitigating circumstances may include any aspect of the Defendant's character, background, or life, or any circumstance of the offense that reasonably may indicate that the death penalty is not an appropriate sentence in this case." And the jury was repeatedly informed that its recommendation must be based only upon the evidence and the instructions.

Despite being permitted to argue minor participation, including presenting the testimony of Miller and Carter, and despite the jury being instructed regarding the mitigator, Lowe argues that instructing the jury to not concern itself with Lowe's guilt misled the jury into believing it "could give no effect to" the minor participant mitigator. Lowe argues that although he was allowed to present the mitigation, the fact that the jury believed it could not consider the mitigation violates *Lockett* and *Eddings v. Oklahoma*, 455 U.S. 104 (1982).

"Jury instructions are subject to the contemporaneous objection rule, and in the absence of a contemporaneous objection at trial, relief regarding error in the instructions can be granted on appeal only if that error is fundamental." *Floyd v. State*, 850 So. 2d 383, 403 (Fla. 2002). "Fundamental error is that which 'reaches down into the validity of the trial itself to the extent that a verdict . . . could not have been obtained without [that] error.' " *Id.* (alterations in original) (quoting *Archer v. State*, 673 So. 2d 17, 20 (Fla. 1996)). Here, Lowe did not object to the instruction, and he fails to show that fundamental error, or any error for that matter, occurred.

As an initial matter, we note that defense counsel *himself* during closing "ma[d]e it clear" to the jury that the defense was "not contesting that Rodney Lowe is guilty of first degree murder" and was instead asking the jury "to look at the evidence" and "take into consideration that someone else was in that store with

Rodney Lowe on July 3rd, 1990." Even putting aside that fact, we find no error in the instructions given to the jury. Moreover, in the absence of evidence to the contrary, we presume that jurors follow the trial court's instructions. *See Hurst v. State* (*Hurst*), 202 So. 3d 40, 63 (Fla. 2016) ("In a capital case, the gravity of the proceeding and the concomitant juror responsibility weigh even more heavily, and it can be presumed that the penalty phase jurors will take special care to understand and follow the law."), *cert. denied*, 137 S. Ct. 2161 (2017). Here, the jury heard testimony related to Lowe's role in the crime. After being properly instructed, the jury made a unanimous recommendation that the death penalty was appropriate. There is nothing to suggest that the jury was led to believe it could not consider the minor participant mitigator. And the trial court's sentencing order reveals that the trial court rejected the minor participant mitigator for several reasons, including that the trial court found neither Miller nor Carter to be credible and that the evidence established that Lowe acted alone. Accordingly, we deny Lowe relief on this claim.

## X. Culpability Finding

Lowe argues that this Court's previous decision to remand for a new penalty phase required the trial court to make *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987), findings and that the trial court therefore

fundamentally erred by failing to give the *Enmund*/*Tison* instruction. The State counters that Lowe declined an *Enmund*/*Tison* instruction. We deny Lowe relief.

As an initial matter, nowhere in our previous decision did we mention *Enmund* or *Tison* let alone indicate that we were remanding for resentencing for an *Enmund*/*Tison* finding. Instead, as noted above, we found ineffective assistance of counsel under *Strickland* regarding counsel's failure to "discover[] evidence to call into question Blackmon's alibi and Blackmon's contention that he did not participate in the crimes." *Lowe*, 2 So. 3d at 40. That evidence included testimony from both Miller and Carter regarding Blackmon's purported confessions to shooting Burnell. *Id.* at 41. And we noted that the testimony "provided credible support for two of the mitigating circumstances raised by defense counsel," including "the disproportionate punishment mitigator." *Id.*

During the charge conference, the trial judge specifically raised the issue of giving an *Enmund*/*Tison* instruction. After questioning whether either side was requesting the instruction, defense counsel stated, "Well, before we tell you we're not gonna ask for it, I again would just ask for the evening to make sure that I don't wanna ask for it." Defense counsel then indicated they would research the issue and email the prosecutor to "have that worked out." The next day, defense counsel did not ask for an *Enmund*/*Tison* instruction and instead announced they were "okay" with revised instructions that had been provided by the prosecutor. After

the trial court instructed the jury, Lowe agreed the instructions were read in accordance with the trial court's rulings.

Jury instructions "are subject to the contemporaneous objection rule, and, absent an objection at trial, can be raised on appeal only if fundamental error occurred." *State v. Delva*, 575 So. 2d 643, 644 (Fla. 1991). Fundamental error occurs only when the omission is material to what the jury must consider in order to reach its verdict. *Id.* at 645. Lowe did not object to the absence of an *Enmund/Tison* instruction and therefore this claim is unpreserved. Indeed, defense counsel requested time to research the specific issue and, after being granted the time, declined to request the instruction. On this record, any error was invited, and Lowe may not "be heard to complain of that error on appeal." *Pope*, 441 So. 2d at 1076. In any event, Lowe is unable to show fundamental error. Lowe points to this Court's decisions in *Jackson v. State*, 502 So. 2d 409, 413 (Fla. 1986), and *Diaz v. State*, 513 So. 2d 1045, 1048 n.2 (Fla. 1987), as mandating reversal. We disagree.

In *Enmund*, the Supreme Court held that, in the context of felony murder, it was unconstitutional to impose the death penalty on a defendant "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." 458 U.S. at 797. The Supreme Court later clarified that

- 47 -

*Enmund*'s requisite culpability finding could be made by "an appellate court, a trial judge, or a jury." *Cabana v. Bullock*, 474 U.S. 376, 392 (1986).

In the wake of *Enmund* and *Cabana*, this Court, out of concern that an appellate court's factual findings may in some cases be inadequate, set forth a procedure for trial courts to follow "in appropriate cases." *Jackson*, 502 So. 2d at 413. Under that procedure, the penalty phase jury is first to be instructed "that in order to recommend a sentence of death, the jury must first find that the defendant killed or attempted to kill or intended that a killing take place or that lethal force be employed." *Id.* And the trial court judge is "to make an explicit written finding that the defendant killed or attempted to kill or intended that a killing take place or that lethal force be employed, including the factual basis for the finding, in its sentencing order." *Id.*

In *Tison*, the Supreme Court expanded the *Enmund* culpability requirement, holding that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." 481 U.S. at 158. And in the wake of *Tison*, this Court modified its previously announced procedures to reflect that *Tison* had expanded the culpability requirement. *Diaz*, 513 So. 2d at 1048 n.2. Again, we did so because "an appellate court's factual findings may be inadequate in some cases." *Id.*

- 48 -

As an initial matter, Lowe points us to no authority to support reversal, based on lack of an *Enmund*/*Tison* jury instruction, in a case in which the convicted defendant is the only person to have been conclusively linked to the crime and in which there is no evidence showing that any other person has ever even been charged with the same crime. Moreover, Lowe's mandatory reversal argument ignores that in *Diaz*, this Court, in rejecting a defendant's argument regarding lack of an *Enmund* instruction, itself made the requisite culpability finding, "[b]ased on our review of the record." *Id.* at 1048. Here, although Lowe consistently argued that he was not the only participant and that someone else was the shooter, the trial court's sentencing order makes clear that, among other things, Miller and Carter were not credible witnesses and that the evidence established that Lowe acted alone. And the sentencing order makes clear why the trial court concluded that Lowe acted alone. The fact that the sentencing order does "not engage in a specific *Enmund*/*Tison* analysis" does not change our conclusion. *Pearce v. State*, 880 So. 2d 561, 575 (Fla. 2004) (rejecting the defendant's *Enmund*/*Tison* argument because the defendant's role in the murder was "explained in detail in the sentencing order" and was "supported by the evidence").

The record here supports the finding that Lowe "was not merely an aider or abetter in a felony where a murder was committed by others." *Stephens v. State*, 787 So. 2d 747, 760 (Fla. 2001). And the record supports the finding of "major

- 49 -

participation in the felony committed, combined with reckless indifference to human life." *Tison*, 481 U.S. at 158. Lowe is not entitled to relief on this claim.

## XI. Sentencing Options

Because Lowe committed the first-degree murder in 1990, the two sentencing options available at the time of his new penalty phase were either death or life imprisonment without the possibility of parole for twenty-five years. *See* § 775.082(1), Fla. Stat. (1989). That is the case even though at the time of Lowe's new penalty phase, the Legislature had amended the sentencing statute to eliminate any possibility of parole in life sentences for first-degree murder. *See Bates v. State*, 750 So. 2d 6, 10 (Fla. 1999) (concluding that the amended sentencing statute did not apply retroactively); *see also* ch. 94-228, § 1, at 1577, Laws of Fla. Lowe argues that the jury was misled regarding the effect of a life sentence and was prejudiced by the State's argument relying on the prior death sentence. More specifically, he argues that because the jury was told he would be credited for time served and because he was precluded from discussing the improbability of his release on parole and from mentioning his fifteen-year consecutive sentence for attempted robbery, the jury was misled as to the effect of a life sentence without the possibility of parole for twenty-five years. We disagree.

Before voir dire, the State filed a motion in limine seeking to preclude Lowe from arguing that, given how the parole system works, he would not be released

after serving the mandatory twenty-five years of his sentence if the judge sentenced him to life. The trial court eventually ruled that neither side could argue anything related to the parole system, including that Lowe, who had already served approximately twenty years in prison, could get out in a few years if given a life sentence.[15] The trial court also ruled that the jury could be informed of Lowe's conviction for attempted robbery but could not be informed whether the fifteen-year sentence was consecutive or concurrent.

During voir dire, a potential juror asked the prosecutor whether with a life sentence, there is a chance for parole after twenty-five years. The prosecutor explained that Lowe would be eligible for parole after twenty-five years but that it did not mean he would get out, that Lowe would only be "eligible for parole," that the parole decision was not up to the courts, and that it was not something the prospective juror should consider. The prosecutor then asked the prospective juror whether he understood what she (the prosecutor) was saying, and the prospective juror responded in the affirmative.

Another prospective juror then asked the prosecutor whether Lowe would receive credit for time served and asked when Lowe was originally sentenced. The prosecutor answered that Lowe would receive credit for time served. As the

_____

15. The prosecutor explained that the State would not be arguing that if given a life sentence, Lowe might get out in just a few short years.

prosecutor was answering the second part of the question, defense counsel objected and stated that it was improper to respond to such questions. During the ensuing sidebar, the trial court referenced this Court's case law, including *Gore v. State*, 706 So. 2d 1328 (Fla. 1997), for the proposition that if the jury asks such questions, the jury may be told the truth. And the trial court observed that the prosecutor properly answered the questions. After the sidebar, the trial judge directly addressed the prospective juror. The trial judge explained that Lowe would indeed receive credit for time served and then emphasized that parole eligibility should not factor into deliberations:

> THE COURT: Also, but, as far as eligibility, none of us in the judicial system have anything to do with whether a person is either granted parole or not granted parole, so we're unable to speculate on the likelihood of parole and it just is out of our hands.
> On the other hand, also, that should not be a consideration. The only consideration that you should make in making your determination is the aggravating factors and the mitigating factors. That should not enter into your decision making in your deliberations.

Neither of these two prospective jurors was selected to sit on the actual jury.

In instructing the jury prior to deliberations, the trial judge informed the jury of the two sentencing options. The trial judge also repeatedly explained that the jury was to base its decision only on the evidence and the jury instructions. The trial judge later explained: "Before you ballot you should carefully weigh, sift and consider the evidence, realizing that a human life is at stake, and bring your best judgment to bear in reaching your advisory sentence." After being instructed, the

jury deliberated for approximately two hours before unanimously recommending a sentence of death.

Lowe fails to establish error. This Court has repeatedly addressed the issue of whether, in a resentencing proceeding for a defendant who committed a pre-1994 first-degree murder, the trial court abuses its discretion by answering (or not answering) questions posed by the actual jury regarding parole eligibility and credit for time served if given a life sentence. *See, e.g.*, *Armstrong v. State*, 73 So. 3d 155, 173-74 (Fla. 2011) (finding no abuse of discretion in the trial court's decision to instruct the jury that the defendant would be credited with time served, even though the trial court did not also instruct the jury that the defendant "was not guaranteed parole at or after 25 years"); *Green v. State*, 907 So. 2d 489, 496-99 (Fla. 2005) (finding no abuse of discretion in the trial court's decision to instruct the jury that the defendant would receive credit for time served and that "there is no guarantee that the defendant would be granted parole at or after 25 years").[16] This Court has also repeatedly declined to find error when the trial court excludes certain irrelevant testimony or argument regarding a defendant's other convictions or the likelihood of parole. *See, e.g.*, *Merck*, 975 So. 2d at 1059-60 (finding the

_____

16. In 2014, subsequent to Lowe's new penalty phase, Florida's Standard Criminal Jury Instruction 7.11 was amended based on *Green*. *See In re Standard Jury Instructions in Criminal Cases—Report No. 2013-03*, 146 So. 3d 1110, 1120 (Fla. 2014).

trial court did not abuse its discretion "in excluding proffered expert testimony regarding Florida's parole procedures and [the defendant's] likelihood of being paroled"); *Bates*, 750 So. 2d at 11 (rejecting the defendant's argument that it would have been "relevant mitigation" for the jury to hear about his other consecutive sentences). The trial court's decisions and instructions here were consistent with our precedent. And the prospective jurors were repeatedly told not to concern themselves with the likelihood of parole. Accordingly, there is no error.

We also reject Lowe's reliance on *Hitchcock v. State*, 673 So. 2d 859 (Fla. 1996). We have made clear that *Hitchcock* error occurs when the State argues that a defendant nearing the expiration of the twenty-five years should be sentenced to death in order to avoid the possibility of parole. *See, e.g.*, *Merck*, 975 So. 2d at 1060 n.3; *Bates*, 750 So. 2d at 11; *Gore*, 706 So. 2d at 1333. Here, the State never argued or suggested that Lowe should be sentenced to death because he would otherwise soon be eligible for parole. The record does not support the conclusion that the State "inject[ed] [the defendant's] future dangerousness into its evidence or argument." *Bates*, 750 So. 2d at 11. Lastly, we reject Lowe's related argument that he was prejudiced by the State's "rel[iance] on the prior death sentence" during closing argument. Not only was the issue unpreserved, but, as noted above, several of Lowe's own witnesses informed the jury of Lowe's prior status on death row. Lowe is not entitled to relief on this claim.

## XII. Sentencing Order

Lowe claims he is entitled to a new penalty phase on the grounds that the trial court did not independently weigh the aggravating and mitigating circumstances and thus did not comply with section 921.141, Florida Statutes, and *Spencer*. He argues that the sentencing order is a verbatim adoption of the State's sentencing memorandum with respect to the aggravation and analysis sections. And he points to some inconsistencies between the weight assigned to certain mitigators in the mitigation and analysis sections. We deny Lowe relief.

At the *Spencer* hearing, the trial court requested that both sides submit a sentencing memorandum. In its sentencing order, the trial court ended up adopting virtually all of the State's sentencing memorandum with respect to the aggravation section and most of the State's memorandum with respect to the analysis section. With respect to the mitigation section, the sentencing order did not wholly copy the memorandum of either party; rather, the sentencing order generally followed the format in Lowe's memorandum and then explained the trial court's findings with respect to each proposed mitigator. Although the trial court did overall adopt substantial portions of the State's memorandum verbatim, a review of the memoranda and the sentencing order reveals that the trial court independently engaged in the weighing process. For example, in rejecting the minor participation mitigator, the trial court noted that among other things it personally found both

- 55 -

Lisa Miller and Ben Carter to be not credible or believable witnesses. In addition, the trial court personally assigned a weight to each of the aggravators in the aggravation section and to each of the mitigators in the mitigation section. The trial court also included several paragraphs of its own in the analysis section, including a discussion of the jury's unanimous recommendation.

Lowe cites to *Morton v. State*, 789 So. 2d 324, 333 (Fla. 2001), as requiring reversal. We disagree. In *Morton*, the issue was whether the death sentence imposed by the resentencing judge should be reversed "because the trial judge adopted a majority of the findings from the original sentencing judge's sentencing order." *Id.* at 334. Although we cautioned resentencing judges to avoid adopting prior sentencing orders or substantial parts thereof, we rejected the defendant's argument for a new penalty phase because, among other things, "the resentencing order included differences indicating that the resentencing judge did fulfill his statutory responsibilities." *Id.* We find sufficient differences exist in this case between the State's memorandum and the sentencing order to show that the trial court independently engaged in the weighing process. *See Valle v. State*, 778 So. 2d 960, 964 n.9 (Fla. 2001) ("In the sentencing context, this Court has held that the trial court may not request that the parties submit proposed orders and adopt one of the proposals verbatim without a showing that the trial court independently weighed the aggravating and mitigating circumstances."); *see also Farr v. State*,

124 So. 3d 766, 781-82 (Fla. 2012) (rejecting the defendant's postconviction claim that the sentencing order "simply cop[ied] the State's sentencing memorandum verbatim," given that the trial judge made certain changes to the memorandum).

Regarding the inconsistencies Lowe references in the trial court's weighing of certain mitigators, we find they do not show abdication by the trial judge of its responsibility and do not hamper this Court's review. These inconsistencies appear to stem from the fact that the trial court personally assigned a weight to each of the mitigators in the mitigation section and then later adopted most of the State's memorandum with respect to the analysis section, in which the State discussed weight to be assigned to the proposed mitigators. However, we agree with the State that these inconsistencies are generally minor, and we find that any error is harmless beyond a reasonable doubt. For example, there is no significant difference here between an initial finding that mitigation evidence is entitled to "little weight" and a subsequent mention of that mitigation being entitled to "little to no weight." Regarding the "good behavior while in confinement" mitigator, which the trial court initially assigned "moderate weight" but later mentioned in the analysis section as being not mitigating and "only entitled to little or no weight," we conclude that this inconsistency does not make a significant difference in the overall calculus, particularly given that the trial court found that four

aggravators were proven and assigned each "great weight." Accordingly, Lowe is not entitled to relief as to this claim.

## XIII. Aggravators

Lowe argues the following aggravators were unlawfully presented to the jury and applied to him as a basis for his death sentence: (1) on community control; (2) prior violent felony; and (3) avoid arrest. Lowe also argues that he was denied fundamental fairness under the principle of former jeopardy where the State had not sought the community control, avoid arrest, and pecuniary gain aggravators in the original penalty phase. We conclude that Lowe is not entitled to relief.

In reviewing the finding of an aggravating circumstance,

> [I]t is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt—that is the trial court's job. Rather, [this Court's] task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.

*Willacy v. State*, 696 So. 2d 693, 695 (Fla. 1997) (footnote omitted); *see also Occhicone v. State*, 570 So. 2d 902, 905 (Fla. 1990) ("When there is a legal basis to support finding an aggravating factor, we will not substitute our judgment for that of the trial court . . . .").

First, Lowe challenges the community control aggravator, notwithstanding the fact that he conceded the aggravator during closing argument. He argues that

the aggravator only applies to those "on community control" and that individuals sentenced under the youthful offender statute—as was the case with Lowe and the previous robbery he committed in 1987—are instead put in a "community control *program*." We disagree. A simple look at the relevant statutes reveals that the definition of "community control" under section 948.001(3), Florida Statutes (2011), is virtually identical to the definition of "community control program" in section 958.03(2), Florida Statutes (2011), of the Florida Youthful Offender Act. Moreover, chapter 948 itself repeatedly refers to a "community control program." In other words, the Legislature clearly uses the terms interchangeably. The trial court did not err in finding that Lowe qualified for the aggravator.

Second, Lowe challenges the prior violent felony aggravator, again notwithstanding the fact that he conceded the aggravator during closing argument. Lowe argues that the aggravator was unlawfully applied because his conviction was for robbery without a weapon for which he was given a youthful offender sentence, and the crime was not life threatening. "Whether a crime constitutes a prior violent felony is determined by the surrounding facts and circumstances of the prior crime." *Gonzalez*, 136 So. 3d at 1150 (quoting *Spann v. State*, 857 So. 2d 845, 855 (Fla. 2003)). Additionally, "any evidence showing the use or threat of violence to a person during the commission of such felony would be relevant in a sentencing proceeding." *Delap v. State*, 440 So. 2d 1242, 1255 (Fla. 1983).

For Lowe's prior conviction of robbery, the facts were that after the victim (Crosby) drove his van home from the library one evening and pulled into his own driveway, Lowe, who had earlier broken into and was quietly hiding in the back of Crosby's van, grabbed Crosby from behind, put something sharp up against Crosby's neck, which Crosby thought might have been a knife, told Crosby "don't move, don't turn around, I don't want to hurt you," and instructed Crosby to turn over his wallet and leave the keys on the dashboard. Crosby complied, and Lowe fled with the van before being apprehended. The trial court here relied on these surrounding facts and circumstances and did not err in finding that Lowe qualified for the aggravator.[17] In any event, we have previously noted that, for purposes of this aggravator, "robbery is as a matter of law a felony involving the *use or threat* of violence." *Simmons v. State*, 419 So. 2d 316, 319 (Fla. 1982).

---

17. Lowe also invites this Court to hold that even though he was adjudicated guilty and convicted of the previous robbery, the prior violent felony aggravator is inapplicable because he was a juvenile at the time and was sentenced as a youthful offender. We decline to do so. *See Lowe*, 2 So. 3d at 46 (finding prior juvenile convictions can be used to establish an aggravating factor); *Green v. State*, 975 So. 2d 1090, 1112-13 (Fla. 2008) (noting that under Florida's youthful offender statute, "[i]f the trial court adjudicates the defendant guilty of the charged offense and orders a youthful offender sentence, then the adjudication counts as a conviction"); *England v. State*, 940 So. 2d 389, 406-07 (Fla. 2006) (concluding that *Roper* does not prohibit the use of prior juvenile felony convictions as an aggravating circumstance); *Campbell v. State*, 571 So. 2d 415, 418 (Fla. 1990) (finding that prior juvenile convictions can be considered to support the prior violent felony aggravator), *receded from on other grounds by Trease v. State*, 768 So. 2d 1050 (Fla. 2000).

Third, Lowe argues the avoid arrest aggravator was not supported by the evidence. He claims that the only relevant fact cited by the trial court was that he knew Burnell. "To establish the avoid arrest aggravating factor where the victim is not a law enforcement officer, the State must show beyond a reasonable doubt that the sole or dominant motive for the murder was the elimination of a witness." *Connor v. State*, 803 So. 2d 598, 610 (Fla. 2001). "In such cases, proof of the intent to avoid arrest or detection must be very strong." *Hernandez v. State*, 4 So. 3d 642, 667 (Fla. 2009) (citing *Riley v. State*, 366 So. 2d 19, 22 (Fla. 1978)). "Mere speculation on the part of the state that witness elimination was the dominant motive behind a murder cannot support the avoid arrest aggravator." *Consalvo v. State*, 697 So. 2d 805, 819 (Fla. 1996). "Likewise, the mere fact that the victim knew and could identify defendant, without more, is insufficient to prove this aggravator." *Id.* "However, this factor may be proved by circumstantial evidence from which the motive for the murder may be inferred, without direct evidence of the offender's thought processes." *Farina v. State*, 801 So. 2d 44, 54 (Fla. 2001).

Here, the sentencing order lays out all of the evidence from which the trial court concluded that there was no other plausible explanation for the murder other than to eliminate Burnell as a witness. That evidence included: Lowe's statement that he knew Burnell, that he was unaware she worked at the Nu-Pack store, and

- 61 -

that he knew her from when she worked at a different store; Lowe was on community control and would return to prison if he committed another robbery; the absence of evidence showing any struggle or resistance; Burnell had a three-year-old child with her and posed no threat; the silent hold-up alarm was not activated; Lowe wore no mask or gloves; Lowe's fingerprints on the hamburger wrapper indicated he had time to reflect on his actions before the murder; Burnell was shot three times, including twice from very close range; the gunshot wound to the top of Burnell's head was likely the first shot and indicated she was bending over at the time; and various other pieces of evidence indicating that Burnell was shot before any attempt was made to remove money from the register, including the position of Burnell's body when she was found lying on her back. The trial court cited *Jennings v. State*, 718 So. 2d 144, 151 (Fla. 1998), as support that the avoid arrest aggravator can be circumstantially established through these types of factors, including whether the defendant knew and could be identified by the victim, whether the defendant used gloves or wore a mask, whether the victim offered resistance or posed a threat, and whether the killing was a product of reflection as opposed to a reactionary act.

We conclude that any error in the trial court's decision to present the avoid arrest aggravator to the jury and to find that the aggravator was proved was harmless beyond a reasonable doubt. As an initial matter, Lowe's reliance on

*Calhoun v. State*, 138 So. 3d 350 (Fla. 2013), and *Wilcox* is misplaced. In

*Calhoun*, we struck the trial court's finding of the avoid arrest aggravator as

speculative because "[m]ost of the facts on which the trial court relied in support of

finding this aggravator were based on [the defendant's] attempts to avoid arrest

after [the victim's] death, not on his motive to kill [the victim]." *Calhoun*, 138 So.

3d at 362. In *Wilcox*, we struck the aggravator because the only relevant evidence

"support[ed] the theory that [the defendant] murdered [the victim] to protect his

family," not to eliminate a witness. *Wilcox*, 143 So. 3d at 385-86. Here, the

circumstantial evidence relied on by the trial court is related to and consistent with

the theory that Lowe's sole or dominant motivation for the murder was witness

elimination. *See Farina*, 801 So. 2d at 54; *see also McMillian v. State*, 94 So. 3d

572, 580-81, 581 n.16 (Fla. 2012) (finding the medical examiner's testimony

together with the totality of the evidence proved the sequence of shots); *Serrano v.

State*, 64 So. 3d 93, 114 (Fla. 2011) (upholding the avoid arrest aggravator in part

because the victim was personally known to the defendant, and there was no

evidence that the victim offered resistance or posed a threat); *McLean v. State*, 29

So. 3d 1045, 1051 (Fla. 2010) (concluding that the evidence supported giving the

avoid arrest aggravator instruction to the jury, including that the victims "were

compliant and helpless" and the defendant "did not wear a mask or otherwise

disguise his appearance"); *Buzia v. State*, 926 So. 2d 1203, 1211 (Fla. 2006)

(affirming the avoid arrest aggravator in part because the victim did not pose an immediate threat to the defendant). Even if we were to conclude that the circumstantial evidence in this case was insufficient to prove the avoid arrest aggravator and that the aggravator should be stricken, any error by the trial court would be harmless. The trial court concluded that the aggravators "far outweigh" the mitigation offered by Lowe, and three other aggravators would remain—prior violent felony, community control, and pecuniary gain. The trial court assigned great weight to each of these three aggravators and expressly made clear that they "alone justify the imposition of the death penalty in this case." There is no reasonable possibility that any potential error affected the sentence imposed. *See Middleton v. State*, 220 So. 3d 1152, 1172 (Fla. 2017), *cert. denied*, 138 S. Ct. 829 (2018) ("Because we conclude that there is no reasonable possibility that the erroneous findings of the avoid arrest and CCP aggravators contributed to Middleton's death sentence, the errors were harmless."). Lowe is not entitled to relief.

Finally, Lowe argues that his constitutional rights were violated when the State sought, and the trial court found, aggravators that were not sought by the State and were not found by the trial court in the original penalty phase. Although the record reflects that Lowe sought only to exclude the CCP and HAC aggravators, he now argues that the State should not have been permitted to seek

the aggravators of community control, avoid arrest, and pecuniary gain. We have repeatedly stated, in the same context of a resentencing proceeding stemming from a previously vacated death sentence, that this Court applies the "clean slate" rule. *See, e.g.*, *Way v. State*, 760 So. 2d 903, 917 (Fla. 2000) ("[T]he resentencing judge is not obligated to find the same aggravating and mitigating circumstances that were established in the original sentencing proceeding."); *Preston v. State*, 607 So. 2d 404, 409 (Fla. 1992) (noting that a resentencing must be allowed "to proceed in every respect as an entirely new proceeding"); *Teffeteller*, 495 So. 2d at 745 ("The resentencing should proceed *de novo* on all issues bearing on the proper sentence . . . ."). Accordingly, Lowe is not entitled to relief.

## XIV. Mitigators

Lowe argues that the trial court's treatment of mitigation rendered his capital sentence unconstitutional. He argues that the trial court: (1) unlawfully relied on the prior death sentence affirmance; (2) failed to apply the correct law and weight to the statutory age mitigator; (3) improperly assessed the "family relationships" mitigator and used it as aggravation; (4) improperly and arbitrarily used nonstatutory aggravation; and (5) failed to give any weight to uncontested mitigation. This Court requires the sentencing judge to "expressly evaluate in his or her written sentencing order each statutory and non-statutory mitigating circumstance proposed by the defendant." *Ferrell v. State*, 653 So. 2d 367, 371

- 65 -

(Fla. 1995). "The finding of whether a mitigating circumstance has been established is a question of fact that will not be overturned where it is supported by competent, substantial evidence." *Fletcher v. State*, 168 So. 3d 186, 218 (Fla. 2015) (citing *Blanco v. State*, 706 So. 2d 7, 10 (Fla. 1997)). "This Court reviews a trial court's assignment of weight to mitigation under an abuse of discretion standard." *Bevel v. State*, 983 So. 2d 505, 521 (Fla. 2008); *see also Trease v. State*, 768 So. 2d 1050, 1055 (Fla. 2000) (receding from *Campbell v. State*, 571 So. 2d 415 (Fla. 1990), "to the extent [*Campbell*] disallows trial courts from according no weight to a mitigating factor").

First, Lowe claims that the trial court erroneously relied on this Court's prior affirmance of his original death sentence. This argument is insufficiently briefed and otherwise without merit. In the analysis section of its sentencing order, the trial court began by noting that, under *Morton*, it should not rely on the prior sentencing order. The trial court then noted as "instructive" the fact that this Court previously upheld Lowe's initial death sentence based upon the presence of only two aggravators. After pointing out that the new penalty phase involved the State proving those same two aggravators, as well as two additional ones, the trial court then set forth its lengthy analysis of the weighing process explaining why the four proven aggravators, each of which was assigned great weight, "far outweigh" "the mitigation offered by the defendant." Although the trial court referenced our

- 66 -

previous decision, the trial court independently engaged in the weighing process.

Next, Lowe takes issue with the trial court's findings regarding the statutory age mitigator, given that Lowe was just over twenty years old at the time of the murder. He argues that the trial court unlawfully attributed "little weight" and then "little to no weight" to the mitigator and that greater weight should have been assigned due to "the scientifically and constitutionally recognized immaturity of youth and the profoundly mitigating effect of age, both in the caselaw and expert testimony" presented at trial. He also argues that the trial court erroneously required a nexus of age to the offense. We find no abuse of discretion.

As an initial matter, a trial court is not required to assign great weight to the age mitigator. "We have long held that the fact that a defendant is youthful, 'without more, is not significant.' " *Mahn v. State*, 714 So. 2d 391, 400 (Fla. 1998) (quoting *Garcia v. State,* 492 So. 2d 360, 367 (Fla. 1986)). "In Florida, numerical age alone may not be mitigating if not linked to some other material characteristic (e.g., immaturity)." *Lebron v. State*, 982 So. 2d 649, 660 (Fla. 2008). Lowe's reliance on *Lockett* and other cases is unavailing because Lowe was not barred from presenting age as mitigation. Indeed, the trial court considered the mitigator, determined that it was proved, and assigned it little weight. A review of the entire context of the sentencing order reveals that the trial court was not convinced that the evidence showed a link between Lowe's age and "some other material

- 67 -

characteristic." *Id.* The trial court acknowledged that there was testimony to the effect that Lowe was immature at the time, but the trial court relied on certain other evidence in reaching its conclusion that Lowe's age did not in and of itself significantly reduce the degree of his culpability, including that Lowe had been living on his own for several years, maintained gainful employment, and lived with a steady girlfriend in a middle-class neighborhood. *See Sanchez-Torres v. State*, 130 So. 3d 661, 673-74 (Fla. 2013) (rejecting nineteen-year-old capital defendant's claim that the trial court erred in failing to give great weight to the age mitigator, given that the defendant's age was not "linked with some other characteristic of [the defendant] or the crime," and the record "painted a picture of a responsible and reliable young man who had faced difficulties in his life, but had nevertheless consistently held and excelled at the same job for years, provided financial assistance to others, and shouldered numerous responsibilities"); *see also Lebron*, 982 So. 2d at 664 (finding no abuse of discretion in assigning limited weight to certain mitigators because the evidence did not provide "a crucial, missing nexus between these mitigation findings and the life of [the defendant] before the time of the murder"). Lowe has not shown an abuse of discretion.

Next, Lowe argues that the trial court improperly assessed the "family relationships" mitigator and used it as aggravation by incorrectly finding that he came from a "loving, normal functioning family." He argues that the trial court

should have instead found certain other mitigation, including that he was exposed to an alcoholic, brutally abusive father and was shunned by his family—despite the fact that Lowe never suggested to the trial court that he had proven such mitigation. In any event, we reject Lowe's claim and conclude that any error is harmless beyond a reasonable doubt.

In his sentencing memorandum, Lowe contended that the following relevant mitigating circumstance had been proven: "The Defendant is a loving family member and capable of maintaining family relationships." In its sentencing order, the trial court determined that Lowe had proven the following "family relationships" mitigator, which it assigned little weight: "The Defendant comes from a loving, normal functioning family. He has maintained relationships with his mother and sister during his long period of incarceration." In the analysis section of the sentencing order, the trial court discussed, as not particularly mitigating, Lowe's "love for his family and the emotional support he has provided them over the course of his confinement." The trial court later discussed Lowe's "normal upbringing, free from abuse or deprivation," and explained that Lowe's normal life did not mitigate a death sentence.

The essence of Lowe's argument is that instead of focusing solely on Lowe's love for his family, the trial court erred by also finding that Lowe's family loved him and that he had a normal upbringing. We disagree that the trial court

used nonstatutory aggravation.  At worst, the trial court misinterpreted the specific mitigation proposed by Lowe.  However, it is difficult to fault the trial court for doing so, given that Lowe himself presented the testimony of his mother, Sherrie, who very much painted the picture of Lowe having a normal life in an average family that did lots of activities together, including many related to church.  She testified that Lowe was an easy child to raise until about age fifteen, and she attributed Lowe's troubles as stemming entirely from peer pressures coming from outside the home, in particular from kids who had very lenient boundaries.  She also painted the picture of Lowe's father as a very responsible family man.  She did mention that she and Lowe's father separated for "a short time" when Lowe was twelve years old because Lowe's father usually drank one night per week and would sometimes use inappropriate language when doing so.  But she also testified that during their six-week separation, Lowe's father made positive changes including that he stopped drinking.  Lastly, she testified that she and Lowe's father had guidelines for disciplining their children depending on the infraction, including revoking privileges and administering some corporal punishment.

Although Lowe also presented the testimony of Dr. Riebsame, who testified that Lowe's criminal activity problems in middle adolescence began "in response to what's going on in the household"—i.e., running away from his father's discipline, being embarrassed by Jehovah's Witnesses evangelizing, and being

shunned by his family and the congregation—the trial court was free to reject that testimony in favor of Lowe's mother's testimony. *See Hampton v. State*, 103 So. 3d 98, 117 (Fla. 2012) ("A trial court may reject mitigation based on expert testimony, even if that testimony is uncontroverted, 'where it is difficult to square with the other evidence in the case.' " (quoting *Morton,* 789 So. 2d at 330)). Moreover, regarding corporal punishment, Dr. Riebsame himself made it very clear that he was not testifying that the punishment Lowe received was abusive.

In the end, even assuming that the trial court should not have considered Lowe's loving family and normal upbringing and should have instead found mitigation involving negative family relationships, there is no reasonable possibility that the mitigation would be sufficient to outweigh the substantial aggravation in this case. We deny relief.

Next, Lowe argues that the trial court used unfounded nonstatutory aggravation by making certain comments that were "totally unrelated to any of the aggravation." We disagree. When read in context, almost all of the complained-of comments—i.e., that Lowe unlawfully possessed a firearm, was given a great chance to rehabilitate himself, and otherwise made his own decision to commit a murder—go directly to explaining why the trial court assigned great weight to the community control aggravator. The trial court explained that Lowe committed the murder while being on community control for only a relatively short period of

- 71 -

time, that the terms of his community control prohibited him from possessing a firearm, and that he blatantly flouted the rules by which he agreed to abide. There is nothing improper about the trial court's explanation of the weight it assigned to the aggravator in the overall context of weighing the aggravation and mitigation. To the extent any remark by the trial court can be considered improper, we conclude that it "does not reflect an underlying improper sentencing rationale." *Oyola v. State*, 158 So. 3d 504, 509 (Fla. 2015). We deny Lowe's claim.

Finally, Lowe argues that the trial court assigned no weight to much nonstatutory mitigation without adequately explaining its decision, thus violating *Trease*. Here, the trial judge personally assigned "no weight" to three of the ten nonstatutory mitigators proposed by Lowe, and two of those three were determined by the trial judge to "not in fact" be mitigating circumstances. Although the sentencing order later contains some inconsistencies and may be "less than a model of clarity," *Armstrong v. State*, 642 So. 2d 730, 739 (Fla. 1994), it is apparent that the trial court considered each of the mitigating circumstances proposed by Lowe and determined that such circumstances hardly distinguished Lowe from other members of society, were supported by "underwhelming" evidence, or were in fact not mitigating. To the extent the trial judge should have gone into greater detail, any error was harmless beyond a reasonable doubt. *See Deparvine v. State*, 995 So. 2d 351, 381 (Fla. 2008) (concluding that any error in not treating certain

mitigation in greater detail was harmless beyond a reasonable doubt, given that four proven aggravators were each assigned "great weight" and that little weight was given to the mitigating circumstances described in the sentencing order). We deny Lowe's claim.

## XV. *Hurst v. Florida*

Lowe relies on *Ring v. Arizona*, 536 U.S. 584 (2002), to argue that the trial court erred in denying his requests for special verdict forms and jury instructions to separately and unanimously find each aggravator beyond a reasonable doubt. While Lowe's appeal was pending, the United States Supreme Court issued its decision in *Hurst v. Florida*, and on remand we issued our decision in *Hurst*. In the wake of *Hurst v. Florida* and *Hurst*, we granted supplemental briefing to address the impact of those decisions on Lowe's sentence.

In *Davis v. State*, 207 So. 3d 142, 175 (Fla. 2016), *cert. denied*, 137 S. Ct. 2218 (2017), this Court held that a jury's unanimous recommendation of death is "precisely what we determined in *Hurst* to be constitutionally necessary to impose a sentence of death" because a "jury unanimously f[inds] all of the necessary facts for the imposition of [a] death sentence[] by virtue of its unanimous recommendation[]." Here, the jury was informed that before it could consider the death penalty, it must first determine that at least one aggravating circumstance has been proven beyond a reasonable doubt. Also, as in *Davis*, the jury was informed

- 73 -

"that it needed to determine whether sufficient aggravators existed and whether the aggravation outweighed the mitigation *before* it could recommend a sentence of death." *Id.* at 174. Among other things, the jury was also informed that, regardless of its findings, it was neither compelled nor required to recommend a sentence of death. Despite the mitigation presented and the fact that the jury was properly informed that it may consider mitigating circumstances proven by the greater weight of the evidence, the jury unanimously recommended that Lowe be sentenced to death. "Th[is] recommendation[] allow[s] us to conclude beyond a reasonable doubt that a rational jury would have unanimously found that there were sufficient aggravators to outweigh the mitigating factors." *Id.*

This Court has consistently relied on *Davis* to deny *Hurst* relief to defendants who have received a unanimous jury recommendation of death. *See, e.g.*, *Cozzie v. State*, 225 So. 3d 717, 733 (Fla. 2017), *cert. denied*, 138 S. Ct. 1131 (2018); *Morris v. State*, 219 So. 3d 33, 46 (Fla.), *cert. denied*, 138 S. Ct. 452 (2017); *Tundidor v. State*, 221 So. 3d 587, 607-08 (Fla. 2017), *cert. denied*, 138 S. Ct. 829 (2018); *Oliver v. State*, 214 So. 3d 606, 617-18 (Fla.), *cert. denied*, 138 S. Ct. 3 (2017); *Truehill v. State*, 211 So. 3d 930, 956-57 (Fla.), *cert. denied*, 138 S. Ct. 3 (2017). Lowe's arguments do not compel departing from our precedent. Because the *Hurst* error in Lowe's penalty phase was harmless beyond a reasonable doubt, he is not entitled to a new penalty phase.

## XVI. Incomplete Record on Appeal

Lowe argues that certain missing items render the record incomplete and prevent a complete review. We reject Lowe's claim because, among other things, he fails to explain how he is prejudiced by any of the missing items or has been hindered from presenting meritorious appellate issues tied to any of the items. *See Rodriguez v. State*, 919 So. 2d 1252, 1287 (Fla. 2005) ("Rodriguez has not sufficiently pled this claim as he has not explained what issues he was unable to raise as a result of any missing or inaccurate record. Thus, Rodriguez is not entitled to relief on this claim."); *Johnson v. State*, 442 So. 2d 193, 195 (Fla. 1983) ("In the absence of some clear allegation of prejudicial inaccuracy we see no worthwhile end to be achieved by remanding for new trial.").

First, Lowe claims that the absence of the completed juror questionnaires, which were destroyed, precludes proper review. Lowe's argument primarily focuses on the trial court's decision to grant the State's challenge for cause (later changed to a peremptory strike) regarding prospective juror Charles Simard—an issue we have already addressed. Lowe asserts that there are "substantial grounds for reversal based on the trial court's exclusion of Mr. Simard that cannot be developed adequately" without the questionnaires. But Lowe fails to identify any such grounds. *See Armstrong v. State*, 862 So. 2d 705, 721 (Fla. 2003) ("Armstrong has failed to link a meritorious appellate issue to the allegedly

missing record and thus cannot establish that he was prejudiced by its absence.").

In any event, the record reflects that the entire voir dire was transcribed, and both parties had copies of the questionnaires from which they were able to question the prospective jurors. The absence of the questionnaires has not hindered our ability to conduct meaningful review on this issue. Lowe does not identify any other potential voir dire errors. We deny relief.

Second, Lowe asserts that meaningful appellate review is precluded because the court reporter did not certify the accuracy of the transcription of certain recordings played during the resentencing, including Lowe's statement, and there are a number of inaudible sections. Here, the reporter transcribed what was played to the jury and certified that such was done to the best of her ability. Moreover, the reporter certified the accuracy of the transcript at the end of each volume. In any event, Lowe fails to identify what specific prejudice has resulted from the inaudible portions of the trial transcript. *See Jones v. State*, 923 So. 2d 486, 489 (Fla. 2006) ("[T]his Court requires that the defendant demonstrate that there is a basis for a claim that the missing transcript would reflect matters which prejudice the defendant."); *Darling v. State*, 808 So. 2d 145, 163 (Fla. 2002) ("Darling has failed to demonstrate what specific prejudice, if any, has been incurred because of the missing transcripts."). We deny relief.

Finally, Lowe argues that without the computer-generated diagram used by the State during opening argument and the mannequin used by the medical examiner during his testimony, this Court cannot determine whether the use of either item was improper. As an initial matter, these items were not entered into evidence or otherwise documented by Lowe. They were not items that could supplement the record under Florida Rule of Appellate Procedure 9.200(a)(1). Moreover, as we explained earlier in this opinion, the trial court did not abuse its discretion in permitting the use of either item. We deny relief.

## XVII. Proportionality Review

Lowe also challenges the proportionality of his death sentence. Proportionality review is not a quantitative analysis involving comparing the number of aggravators and mitigators, but a qualitative review of the underlying basis for each aggravating and mitigating factor and of the totality of the circumstances as compared to other capital cases. *See Gregory v. State*, 118 So. 3d 770, 785-86 (Fla. 2013). In conducting our proportionality analysis, we "will accept the weight assigned by the trial court to the aggravating and mitigating factors." *Hayward*, 24 So. 3d at 46. "Further, we will not disturb the weight assigned to a particular mitigating circumstance absent an abuse of discretion by the trial court." *Jeffries v. State*, 222 So. 3d 538, 548 (Fla. 2017). As always, we keep in mind that the death penalty is "reserved for only the most aggravated and

least mitigated of first-degree murders." *Urbin v. State*, 714 So. 2d 411, 416 (Fla. 1998).

In following the jury's unanimous recommendation of death, the trial court found the following five aggravating circumstances, merged to four: (1) under sentence of imprisonment/community control (great weight); (2) prior violent felony (great weight); (3A) murder in the course of a felony (great weight) merged with (3B) pecuniary gain; and (4) avoid arrest (great weight). The trial court found one statutory mitigator, statutory age (little weight). Regarding the ten nonstatutory mitigators argued by Lowe, the trial court gave them all little to no weight, except for good behavior while in confinement, which the trial court gave moderate weight. Lowe argues that this case is nowhere near the most aggravated and least mitigated of cases. We disagree and conclude that Lowe's death sentence is proportionate under Florida law, with or without the avoid arrest aggravator. We have affirmed other cases with similar aggravation and mitigation. *See, e.g.*, *Bryant v. State*, 785 So. 2d 422, 437 (Fla. 2001) (finding death sentence proportionate in armed-robbery-turned-murder of store owner shot three times at close range, with three aggravators of prior violent felony, murder committed during course of robbery, and avoid arrest, and one nonstatutory mitigator); *Miller v. State*, 770 So. 2d 1144, 1146 n.1, 1150 (Fla. 2000) (finding death sentence proportionate with two aggravators of prior violent felony and robbery/pecuniary

gain, no statutory mitigators, and ten nonstatutory mitigators); *Pope v. State*, 679 So. 2d 710, 716 (Fla. 1996) (finding death sentence proportionate in robbery-murder with two aggravators of prior violent felony and pecuniary gain, two statutory mitigators, and several nonstatutory mitigators).

Lowe cites to *Terry v. State*, 668 So. 2d 954, 965 (Fla. 1996), and *Yacob v. State*, 136 So. 3d 539, 550 (Fla. 2014), in support of his argument that Lowe's case is the archetype of a "robbery gone bad." We disagree. As an initial matter, *Terry* and *Yacob* both involved far less weighty aggravation than Lowe's case. *Terry* involved the two aggravators of (1) during the course of a robbery merged with pecuniary gain and (2) prior violent felony, and this Court noted that, among other things, the prior violent felony aggravator did not "represent an actual violent felony previously committed by" the defendant. *Terry*, 668 So. 2d at 965. And *Yacob* involved the single merged aggravator of during the course of a robbery and pecuniary gain. *Yacob*, 136 So. 3d at 551. Moreover, it cannot reasonably be said that Lowe's case involves a "robbery gone bad." There is no indication that Burnell resisted or impeded an attempted robbery. Instead, the record establishes that a decision was made to shoot Burnell three times, including twice from very close range, before any attempt was made to retrieve the money. *Terry* and *Yacob* are wholly distinguishable.

We also find *Johnson v. State*, 720 So. 2d 232, 238 (Fla. 1998), to be

distinguishable. *Johnson* involved the two aggravators of prior violent felony and burglary/pecuniary gain, the statutory mitigator of age, and six nonstatutory mitigators, one of which the trial court accorded substantial weight. *Id.* This Court noted that the prior violent felony aggravator was "not strong when the facts are considered" because the aggravator was based in part on an aggravated assault upon the defendant's brother based on a misunderstanding. *Id.* And in balancing the two aggravators, one of which was "not strong," against the mitigators, this Court vacated the death sentence while noting that it was a "close question." *Id.* Lowe's case involves aggravation that is more substantial and mitigation that is less weighty. We similarly find *Ballard v. State*, 66 So. 3d 912 (Fla. 2011), to be distinguishable. *Ballard* was a single aggravator case (CCP) with several statutory mitigators and numerous nonstatutory mitigators. *Id.* at 916 n.1. Lowe's case involves several aggravators assigned great weight. Finally, Lowe cites to *Brooks v. State*, 918 So. 2d 181, 208 (Fla. 2005), *receded from in part by State v. Sturdivant*, 94 So. 3d 434 (Fla. 2012), in support of the proposition that Lowe's death sentence is disproportionate when compared to his equally or more culpable codefendants. But as noted above, the trial court's sentencing order makes clear that the trial court concluded that Lowe acted alone. The record supports that finding.

## XVIII.  Cumulative Error

As his final claim, Lowe argues cumulative error.  In this appeal, Lowe presented several preserved arguments claiming error.  We determined that those arguments either involved no errors or errors that were harmless and not prejudicial to Lowe.  Lowe also presented several unpreserved arguments claiming error.  *See Evans v. State*, 177 So. 3d 1219, 1238 (Fla. 2015) ("[W]e also consider [unobjected-to errors] in this analysis.").  We determined that those arguments were either without merit or involved error that was invited or not fundamental or both.  In the end, after reviewing the record and the entire context of the penalty phase, we conclude that the cumulative effect of any errors in this case did not deprive Lowe "of a fair penalty phase hearing."  *Card v. State*, 803 So. 2d 613, 622 (Fla. 2001).  Because Lowe has failed to establish that any errors occurred that individually or cumulatively entitle him to a new penalty phase, we deny relief.

## CONCLUSION

For the reasons stated above, we affirm Lowe's death sentence.

It is so ordered.

LABARGA and LAWSON, JJ., concur.
CANADY, C.J., concurs specially with an opinion, in which POLSTON, J., concurs.
LEWIS, J., concurs in result and dissents in part with an opinion.
QUINCE, J., concurs in part and dissents in part with an opinion.
PARIENTE, J., dissents with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

CANADY, C.J., concurring specially.

I concur in the opinion except regarding the *Hurst* issue, on which I would conclude that there was no error. The jury's verdict convicting Lowe of attempted armed robbery with a firearm satisfies the requirement of *Hurst v. Florida* that an aggravator be found by the jury. *See Hurst v. State*, 202 So. 3d 40, 77-82 (Fla. 2016) (Canady, J., dissenting).

POLSTON, J., concurs.

LEWIS, J., concurring in result and dissenting in part.

Although I am in agreement with the result of the majority's opinion, I write to voice my disagreement with the majority's conclusion that Lowe's avoid arrest aggravator is supported by competent, substantial evidence. When the victim is not a law enforcement officer, proof of intent to avoid arrest and detection must be very strong. *Green v. State*, 975 So. 2d 1081, 1087 (Fla. 2008) (citing *Jones v. State*, 963 So. 2d 180, 186 (Fla. 2007)). Competent, substantial evidence does not support the conclusion that the sole or dominant motive behind Burnell's murder was witness elimination as is required by our jurisprudence. *Cf. Wilcox v. State*, 143 So. 3d 359, 384-86 (Fla. 2014) (reversing a finding of the avoid arrest aggravator because the evidence failed to demonstrate that the dominant motive for the murder was to avoid arrest); *Green*, 975 So. 2d at 1086-88 (same); *Jones*, 963

- 82 -

So. 2d at 186-87 (same); *Hurst v. State*, 819 So. 2d 689, 695-96 (Fla. 2002) (same); *Connor v. State*, 803 So. 2d 598, 610 (Fla. 2001) (same); *Geralds v. State*, 601 So. 2d 1157, 1164 (Fla. 1992) (same); *Cook v. State*, 542 So. 2d 964, 970 (Fla. 1989) (same); *Garron v. State*, 528 So. 2d 353, 360 (Fla. 1988) (same); *Perry v. State*, 522 So. 2d 817, 820 (Fla. 1988) (same); *Floyd v. State*, 497 So. 2d 1211, 1214-15 (Fla. 1986) (same); *Caruthers v. State*, 465 So. 2d 496, 499 (Fla. 1985) (same); *Rembert v. State*, 445 So. 2d 337, 340 (Fla. 1984) (same). Here the evidence does not support a finding that Lowe's dominant motive was to avoid arrest. Lowe knew the victim, however, this Court has stated that "the mere fact that the victim knew and could identify defendant, without more, is insufficient to prove this aggravator." *Hurst*, 819 So. 2d at 696 (quoting *Consalvo v. State*, 697 So. 2d 805, 819 (Fla. 1996)). Thus, while the evidence reflects that Lowe may have had several motives for killing Burnell, it does not support a finding that Lowe's dominant motive was to avoid arrest. Accordingly, I would conclude that the majority's holding with regard to Lowe's avoid arrest aggravator is contrary to this Court's fundamental jurisprudence. For the reasons set forth above, I concur in result only and dissent in part.

QUINCE, J., concurring in part and dissenting in part.

I concur with my colleagues that Lowe is not entitled to relief on the majority of his claims; however, I cannot agree that the *Hurst* error in this case is

harmless beyond a reasonable doubt. The majority supports this conclusion by relying primarily on the jury's unanimous recommendation for death. The majority finds that because the jury unanimously recommended death, the Court can conclude beyond a reasonable doubt that a rational jury would have unanimously found all of the findings necessitated by *Hurst*, 202 So. 3d at 44. I respectfully disagree for three reasons.

First, the trial judge improperly curtailed Lowe's ability to fully inform the jury regarding the operation of Florida's parole system and Lowe's consecutive fifteen-year sentence for robbery. Additionally, the prosecutor and the trial court explained to the jury that Lowe would get credit for time served and that the court could not speculate as to when Lowe would be released on parole. As the majority states, after the State told the jurors that Lowe would get credit for time served, the court explained:

> Also, but, as far as eligibility, none of us in the judicial system have anything to do with whether a person is either granted parole or not granted parole, so we're unable to speculate on the likelihood of parole and it is just out of our hands.
> On the other hand, also, that should not be a consideration. The only consideration that you should make in making your determination is the aggravating factors and the mitigating factors. That should not enter into your decision-making deliberations.

The majority concludes that there was no error in the trial court's instructions to the jury. In support of this holding, the Court relies on *Armstrong,* where we found no error where the jury was informed that the capital defendant on

resentencing was entitled to credit for time served for life without the possibility of parole for twenty-five years option. 73 So. 3d at 173-74. In light of *Hurst*, however, this Court's opinion in *Armstrong* no longer supports the conclusion that this type of error—incompletely explaining to the jury Florida's parole system or credit for time served—is harmless.

Armstrong argued "that the trial court abused its discretion when it failed to instruct the jury that [he] was not guaranteed parole at or after 25 years." *Id.* at 173. We stated that case law "does not require that a jury be instructed on the eligibility of parole," and denied relief because "[t]he jury instruction below was not confusing, misleading, . . . contradictory," or "a misstatement of law." *Id.* at 174. The jury also asked whether Armstrong would be entitled to credit for time served, and the trial court instructed the jury that he would. *Id.* The majority concluded:

> [E]ven if the trial court abused its discretion, it would be of no consequence, because any error is harmless. Armstrong had already been convicted of the crime. It cannot be said that this instruction would have caused the jury to arrive at a conclusion they would not have otherwise reached as there is substantial aggravation in the instant case that provides independent support for the jury recommendation. Accordingly, we conclude that the trial court did not abuse its discretion below.

*Id.*

Justice Pariente concurred in part and dissented in part in *Armstrong*, writing that she "would reverse for a new penalty phase" due to "the trial judge's answer to

a question from the jury regarding sentencing options." *Id.* at 175 (Pariente, J., concurring in part and dissenting in part). Justice Pariente explained that it was "apparent on the face of the jury's inquiry that the jurors had a very logical question regarding the effect of a recommendation of life and wanted to know in advance how such a recommendation would work in this case, since the defendant had already served seventeen years of any sentence to be imposed." *Id.* at 176. She concluded "that by not answering the question to explain that the twenty-five years was not the defendant's actual sentence, but rather the minimum length of a sentence of life, and that there was no guarantee of parole at or after twenty-five years, the court gave the jurors a confusing and incomplete answer, leading them to believe that he would be released in another eight years." *Id.*

This explanation of how the trial court's incomplete explanation as to parole and credit for time served is even more compelling post-*Hurst* for the conclusion that defendants in this situation are entitled to a new penalty phase. It is impossible to know the true effect the information the jury received regarding Lowe's previous death sentence and the lack of appropriate information it received regarding the parole system and Lowe's other sentences had on its unanimous recommendation for death. However, it is clear these errors could have very easily influenced the jury's perception of the case and had an adverse impact on the jury's unanimous recommendation.

Second, the jury was improperly informed that Lowe had previously been sentenced to death. During the State's closing argument, it referenced Lowe's prior death sentence four times:

> (1) "You've heard he's on – has been on death row for the last twenty years. We're asking you to impose the death sentence. Nothing has changed since 1990."
>
> (2) "He's been on death row for twenty years, he's watched 24/7; of course he's gonna act well. He does well in a structured environment, absolutely. That's not the problem."
>
> (3) "Now you've heard the testimony. Nothing has changed since 1990. Nothing. The Defendant's story is still the same, and we've shown you that it's not true, and as a result of that you should send him back to death row."
>
> (4) "With your recommendations you can send Rodney Lowe back to death row, and that's what I'm asking you to do."

These statements, in my view, amount to fundamental error. The majority opinion correctly cites to *Teffeteller*, wherein we held that "a death sentence which has been vacated by this Court should not play a significant role in resentencing proceedings." 495 So. 2d at 745. There, the defendant argued that it was reversible error to inform the jury of his prior sentence of death. *Id.* at 745. In finding that testimony from the State's psychiatric expert did not amount to reversible error, we relied on previous testimony from the defendant's witness and the defendant himself that informed the jury of his prior death sentence. *Id.* at 747.

The defendant also argued that the State's comments during closing improperly informed the jury of his prior death sentence. *Id.* In rejecting that argument, we found that "the single sentence" that referenced the defendant's prior sentence "was not so prejudicial or inflammatory that a new sentencing proceeding [was] required." *Id.* Here, however, the State's comments went beyond a single sentence. The State mentioned several times during its closing that Lowe had been previously sentenced to death and nothing had changed since Lowe's initial sentence of death was imposed. While Lowe did not object during the State's closing, these comments may have influenced the jury and preconditioned it to recommend a death sentence.

Third, we cannot know that the jury found each aggravating factor unanimously, despite the jury's unanimous death sentence recommendation. Because one of the aggravators found by the trial court for the murder in this case—that the capital felony was committed to avoid arrest—requires specific factual findings, *Hurst* requires that the jury, not the trial judge, make that determination. The jury made no such determination in Lowe's case. By ignoring the record and concluding that all aggravators were unanimously found by the jury, the majority is engaging in the exact type of conduct the United States Supreme Court cautioned against in *Hurst v. Florida*, 136 S. Ct. at 622.

Because harmless error review is neither a sufficiency of the evidence review nor "a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence," *State v. DiGuilio*, 491 So. 2d 1129, 1138 (Fla. 1986), I cannot conclude beyond a reasonable doubt that the errors here were harmless, and I would vacate Lowe's death sentence and remand for resentencing.

PARIENTE, J., dissenting.

This is Lowe's direct appeal from resentencing. I dissent because several errors in Lowe's resentencing cry out for this Court to grant Lowe a new penalty phase. Not only did the jury consider an improper aggravating factor of avoid arrest, as explained by Justice Lewis's separate opinion,[18] but the jury was also misled regarding certain key aspects that undoubtedly affected its considerations in recommending between life and death, as explained by Justice Quince's separate opinion.[19] Therefore, because the jury was presented with the improper avoid arrest aggravating factor, received misleading instructions as to its sentencing options, and was further misled as to Lowe receiving credit for time served, we

---

18. Concurring in result and dissenting in part op. at 82-83 (Lewis, J.).

19. Concurring in part and dissenting in part op. at 84-89 (Quince, J.).

cannot conclude that the *Hurst*[20] error in Lowe's resentencing was harmless

beyond a reasonable doubt. *See Davis v. State*, 207 So. 3d 142, 175 (Fla. 2016).

*Hurst* necessarily changed how this Court reviews the information that the

jury considered in making its recommendation as to the appropriate sentence in

each case. This Court has made clear that a proper understanding of Florida's

parole system and defendants receiving credit for time served affects the jury's

ability to understand its sentencing options. *Hitchcock v. State*, 673 So. 2d 859,

863 (Fla. 1996). Former Justice Anstead and I have both expressed the importance

of the trial court's role in fully informing the jury as to the reality of Florida's

parole system. Justice Anstead explained in *Green v. State*, 907 So. 2d 489 (Fla.

2005):

> [E]ven assuming [the trial court's] response [to the jury's inquiry] was
> technically accurate, *the response was clearly flawed for what it did
> not tell the jurors*. First, we should be clear that the response given
> certainly did not favor the defendant since it told the jury that with a
> life sentence the defendant would soon be eligible for parole, not in
> twenty-five years, but in ten, a very short time, indeed, if the jury is
> concerned, as jurors logically would be, with keeping a killer off the
> streets for a long time.

*Id.* at 505 (Anstead, J., concurring in part and dissenting in part) (emphasis added);

*see Armstrong v. State*, 73 So. 3d 155, 176 (Fla. 2011) (Pariente, J., concurring in

---

20. *Hurst v. State* (*Hurst*), 202 So. 3d 40 (Fla. 2016), *cert. denied*, 137 S. Ct. 2161 (2017); *see Hurst v. Florida*, 136 S. Ct. 616 (2016).

part and dissenting in part).  I echoed this sentiment in *Armstrong*, joined by

Justice Labarga, stating:

> [U]nlike the trial judge, the jury has no working knowledge of the
> actual length of the sentence that a defendant is facing if it
> recommends the option of life without the possibility of parole for 25
> years.  Therefore, to the extent that its vote for life or death may hinge
> on concerns that the defendant may be released from prison, the jury
> should be informed of *all relevant information* that bears upon the
> ultimate length of the prison sentence.  In this context, the jury is
> solely dependent upon the instructions from the trial court and the
> answers to questions regarding the actual sentence.

73 So. 3d at 178 (Pariente, J., concurring in part and dissenting in part) (emphasis

added); *see* concurring in part and dissenting in part op. at 85-86 (Quince, J.).

In this case, the cumulative effect of the errors in Lowe's resentencing—the

improper avoid arrest aggravating factor, misleading the jury as to the effect of its

sentencing options, and references to Lowe's prior death sentence—require this

Court to vacate Lowe's death sentence and remand for a new penalty phase

pursuant to *Hurst*.  As in *Armstrong*, the jury's inquiry in this case "regarding the

effect of a recommendation of life" was a "very logical question," considering that

Lowe had already served twenty "years of any sentence to be imposed."  73 So. 3d

at 176 (Pariente, J., concurring in part and dissenting in part); *see Green*, 907 So.

2d at 505 (Anstead, J., concurring in part and dissenting in part).  However, as a

result of the incomplete information given in response to this inquiry, the jury—

without understanding Florida's parole system or knowing that Lowe had an

- 91 -

outstanding consecutive fifteen-year sentence for robbery—was misled to believe that Lowe could be released within five years of resentencing, if sentenced to life with the possibility of parole after twenty-five years instead of death. In fact, the trial court's answer in this case suggested that Lowe would be eligible for release in even less time than what was suggested in *Hitchcock*, *Green*, and *Armstrong*.

Further, the trial court did not allow Lowe to inform the jury of his consecutive fifteen-year sentence for robbery. Even if Lowe was granted parole within a few years of resentencing, he would still be required to serve an additional fifteen years in prison. Therefore, despite the prosecutor's and trial court's suggestions, it was impossible that Lowe would be released sooner than twenty years after resentencing.

The majority concludes that Lowe has not established error, noting that "[n]either of the[] two prospective jurors" who asked questions prompting this explanation "was selected to sit on the actual jury." Majority op. at 52. However, regardless of whether the inquisitive prospective jurors were empaneled, the jury pool heard the information and could have understood the information to suggest that Lowe could be released soon after resentencing. This Court cannot speculate about the effect this incomplete information had on the jury. Once the jury was told that Lowe would receive credit for time served and was eligible for parole after twenty-five years, the defense should have been allowed to properly explain

Florida's parole system and inform the jury of Lowe's consecutive fifteen-year sentence.

Exacerbating the error of misleading the jury as to its sentencing options, the jury heard multiple references to Lowe's prior death sentence throughout the resentencing. In one instance, Chaplain Resinella discussed during direct examination his time as the chaplain on death row and providing counsel to Lowe. In another instance, Warden McAndrew testified on direct examination:

> DEFENSE: Now, you've heard that [Lowe] is housed on death row. He's by himself in a cell?
>
> WARDEN: Yes he is.

*See* majority op. at 36. Dr. Riebsame also referenced Lowe's time on death row during his direct examination, stating:

> RIEBSAME: Often times also more volumes, particularly in a case where there's, you know, a postconviction appeal and a person has been on death row for twenty years.

*See id.*

Finally, as Justice Quince explains, the prosecutor made four references to Lowe's prior death sentence during closing argument and argued that the jury should impose the same sentence imposed before. Concurring in part and dissenting in part op. at 87 (Quince, J.); *see* majority op. at 32-33, 35, 54. Contrary to the majority's assertions, the references to the prior death sentence in *Teffeteller v. State*, 495 So. 2d 744 (Fla. 1986), which this Court determined did not warrant

- 93 -

reversal, are distinguishable. *See* concurring in part and dissenting in part op. at 87-88 (Quince, J.). Even if Lowe's witnesses referenced Lowe's prior death sentence, the State's comments during closing argument compounded the error and went far beyond "merely mentioning the prior sentence of death." *Teffeteller*, 495 So. 2d at 747.

Considering the cumulative effect of these errors in Lowe's resentencing in conjunction with the improper aggravating factor of avoid arrest, as explained by Justice Lewis, it is clear that Lowe's defense was prejudiced. The jury was left with the improper impression that Lowe could have been released from prison shortly after resentencing if sentenced to life instead of death. This impression could have easily "influenced the jury and preconditioned it to recommend a death sentence." Concurring in part and dissenting in part op. at 88 (Quince, J.). Thus, it is impossible for this Court to determine how the inappropriate information the jury received and the information the jury did not receive affected the jury's unanimous recommendation for death.

## CONCLUSION

As this Court stated in *Wood v. State*, 209 So. 3d 1217 (Fla. 2017), "Our inquiry post-*Hurst* must necessarily be the effect of *any error* on the jury's findings, rather than whether beyond a reasonable doubt the trial judge would have still imposed death." *Id.* at 1233 (emphasis added). The errors in Lowe's

resentencing could have easily tainted the jury's recommendation for death.

Therefore, I would vacate Lowe's death sentence and remand for a new penalty phase.

Accordingly, I dissent.

An Appeal from the Circuit Court in and for Indian River County,
Robert L. Pegg, Judge - Case No. 311990CF000658AXXXXX

Antony P. Ryan, Regional Counsel, Steven H. Malone, Special Assistant Regional Counsel, and Melanie L. Casper, Assistant Regional Counsel, Office of Criminal Conflict and Civil Regional Counsel, Fourth District, West Palm Beach, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Leslie T. Campbell, Assistant Attorney General, West Palm Beach, Florida,

for Appellee